1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8   JASON "JENNIFER" LEE SUTTON,

9                       Plaintiff,            Case No. C19-1500-RAJ-SKV

10       v.

11   STATE OF WASHINGTON, *et al*.,            REPORT AND RECOMMENDATION

12                       Defendants.

13

14              INTRODUCTION AND SUMMARY CONCLUSION

15          This is a civil rights action proceeding under 42 U.S.C. § 1983.  Plaintiff Jennifer Sutton

16   is a male-to-female transgender inmate who is currently confined at the Monroe Correctional

17   Complex ("MCC") in Monroe, Washington.  Plaintiff alleges in this action that defendants

18   violated her rights under the Eighth Amendment when they failed to protect her from harm in

19   relation to her assigned housing and when they delayed her request for hormone replacement

20   therapy with deliberate indifference to her gender dysphoria.  Plaintiff also alleges violations of

21   the Americans with Disabilities Act, the Rehabilitation Act, and the Equal Protection Clause of

22   the Fourteenth Amendment.  Finally, plaintiff alleges that defendants violated state law by acting

23

REPORT AND RECOMMENDATION
PAGE - 1

negligently in failing to provide timely and appropriate medical and mental health treatment, and in failing to ensure her physical safety.

Plaintiff identifies the following ten defendants in her second amended complaint: the State of Washington; the Washington State Department of Corrections ("DOC"); Dr. Arieg Awad, acting Medical Director at MCC from October 2018 to present; Dr. Julia Barnett, acting medical director at MCC at time relevant to this action up to October 2018; Theresa L. Cohn, Custody Unit Supervisor at MCC-Twin Rivers Unit ("TRU") at times relevant to this action; Arthur G. Davis, Ph.D., clinical psychologist at MCC; Michael Hathaway, Correctional Program Manager ("CPM") at MCC-TRU; Adelaide O. Horne, Certified Physician's Assistant ("PA-C") at MCC; Dr. Karie Rainer, DOC Director of Mental Health; and Sergeant Silva, unit sergeant at MCC-TRU. Plaintiff seeks an award of damages for the alleged violations of federal and state law.

Defendants have filed a motion for summary judgment seeking dismissal of all claims asserted by plaintiff in her second amended complaint. Dkt. 35. Plaintiff has filed a response in opposition to Defendants' motion (Dkt. 45), and Defendants have filed a reply brief in support of their motion (Dkt. 49). Plaintiff has filed a motion for partial summary judgment seeking judgment as a matter of law on her Eighth Amendment medical deliberate indifference claim, and on her medical negligence claim. Dkt. 40. Defendants have filed a response in opposition to Plaintiff's motion (Dkt. 44), and plaintiff has filed a reply brief in support of her motion (Dkt. 50). The Court, having reviewed the parties' summary judgment motions, all related briefing, and the balance of the record, concludes that defendants' motion for summary judgment should be granted and plaintiff's motion for partial summary judgment should be denied. The Court

REPORT AND RECOMMENDATION
PAGE - 2

further concludes that plaintiff's second amended complaint and this action should be dismissed with prejudice as to plaintiff's federal claims and without prejudice as to plaintiff's state law negligence claims.

<u>BACKGROUND</u>

Plaintiff entered DOC custody in April 1995 and she is currently confined pursuant to convictions for first-degree child molestation, first-degree murder, kidnapping, and custodial assault. *See* Dkt. 36, Attach. C. Plaintiff has been housed in various facilities during her many years in DOC custody, and she is currently confined at the MCC – Washington State Reformatory Unit (WSRU). *Id.* The claims asserted in this action arose following plaintiff's transfer from the Clallam Bay Corrections Center ("CBCC") to the MCC – TRU in May 2018, and they fall into two general categories, those pertaining to her housing assignments during the course of her incarceration at TRU, and those pertaining to the adequacy of the medical and mental health treatment she received for her gender dysphoria during the course of her incarceration at both TRU and WSRU. The Court will set forth the facts pertaining to those two sets of claims separately.

**1.    Housing Assignments at TRU**

Plaintiff arrived at TRU on May 21, 2018, and was housed there until August 28, 2019, when she was transferred to WSRU. Dkt. 36, Attach. C. The Washington State Sex Offender Treatment and Assessment Program is located at TRU, and approximately half of the TRU population consists of inmates incarcerated for sex offenses. *Id.*, ¶ 3. Included in the TRU inmate population at times relevant to this action were a small number of individuals who identified as transgender, gender non-conforming, or intersex. *See id.* During her time at TRU,

REPORT AND RECOMMENDATION
PAGE - 3

1    plaintiff had difficulty finding an appropriate cellmate and DOC staff likewise had difficulty

2    finding a suitable, sustainable housing assignment for her.  *Id.*, ¶ 8; Dkt 41, ¶ 8.  According to

3    plaintiff, she received multiple infractions for refusing cell assignments because of fears for her

4    safety.  Dkt. 41, ¶ 8.

5         Housing assignments at DOC facilities are made in accordance with DOC Policy 420.140

6    and are based on a number of factors including consideration of 18 specific objective criteria set

7    forth in the policy.  *See* Dkt. 36, Attach. A (DOC Policy 420.140, Cell Room Assignments).

8    Among the objective criteria considered in making housing decisions are medical or mental

9    health issues, length of incarceration, physical size and age of the offenders, Prison Rape

10   Elimination Act (PREA) risk assessment and housing assignment requirements, self-disclosed

11   concerns of offenders, commitment offense, incarceration history, and predation/victimization

12   issues.  *Id.*  The policy permits a unit sergeant to request a move for unit needs and it also

13   permits an inmate to request a change in cell assignments.  *Id.*, ¶ 5.  Most changes in cell

14   assignments result from inmate requests.  *Id.*  In order to request a change in cell assignment, an

15   inmate must complete a DOC specified form and all inmates who will be residing in the cell

16   must sign the form indicating they agree to the move.  *Id.*, ¶ 5, Attach. A.

17        At times relevant to this action, Mr. Hathaway was the Correctional Program Manager at

18   TRU and had only limited involvement in determining housing assignments.  *Id.*, ¶ 2.

19   Specifically, due to safety concerns, Mr. Hathaway maintained final approval over proposed

20   moves involving inmates who identified as transgender, gender non-conforming, or intersex as a

21   way of confirming that such moves were consistent with policy.  *Id.*, ¶ 4.  Cell change requests

22   involving these categories of inmates were routed through the housing unit sergeants, and

23

REPORT AND RECOMMENDATION
PAGE - 4

typically the Correctional Unit Supervisor and the classification team would provide input as well. *Id.*, ¶ 5. Requests upon which the team agreed would be forwarded to Mr. Hathaway for final approval. *Id.* As a part of his process in evaluating such requests, Mr. Hathaway would double check the PREA risk assessments for the parties involved to ensure policy housing criteria were met as well as to ensure that the transgender population as a whole was not isolated or segregated from other prisoners at TRU. *Id.*

DOC policy mandates that all offenders under DOC jurisdiction be assessed (and scored) for the risk of sexual victimization and/or predation, and that such information be maintained and used in housing and program assignment decisions. *Id.*, Attach. B (DOC Policy 490.820, Prison Rape Elimination Act (PREA) Risk Assessments and Assignments). There are four potential identifiers that can be assigned to offenders through the risk assessment process: (1) no risk; (2) potential victim; (3) potential perpetrator; or, (4) dual identifier (the offender scores as both a potential victim and a potential perpetrator). *See id.* An offender who scores as a potential risk for victimization may not be housed with an offender who scores as a potential risk for sexual predation or as a dual identifier. *Id.*, ¶ 6. Offenders who score as potential victims or no risk may be housed together, while individuals who score as potential perpetrators may only be housed with offenders who also score as potential perpetrators or as no risk. *Id.*, ¶ 6.

In early 2019, following a meeting between plaintiff and Mr. Hathaway on another issue, plaintiff specifically requested that she be housed either with inmate T.K., also a transgender inmate, or with a second inmate known to her. *Id.*, ¶ 8. Plaintiff indicated to Mr. Hathaway that she and the other inmates were friends and that it would be a better fit if she were housed with a "sister." *Id.* Mr. Hathaway advised plaintiff that he generally did not support moves where two

REPORT AND RECOMMENDATION
PAGE - 5

1   transgender individuals were seeking to be housed together because those types of housing

2   assignments tended not to last long and because there could be a perception that the DOC was

3   separating transgender individuals from the general population.  *Id.*  Plaintiff assured Mr.

4   Hathaway this would be a good move and Mr. Hathaway thereafter sent an email to Ms. Cohn

5   and to Sergeant Cullum, the Custody Unit Supervisor and the unit sergeant respectively,

6   informing them of his consent to consider plaintiff's request to move in with inmate T.K. or with

7   the other inmate specifically identified by plaintiff.  *Id.*, ¶ 8, Attach. D.

8        Plaintiff and inmate T.K. signed a form requesting to move in together and submitted it

9   for consideration.  Dkt. 27, ¶ 34.  At the time the request was submitted, both plaintiff and

10  inmate T.K. had been assigned PREA risk assessment identifiers of potential victim.  Dkt. 36, ¶

11  9, Attach. F.  Mr. Hathaway reviewed the move request and discovered nothing to make him or

12  the reviewing team believe inmate T.K. would pose a threat to plaintiff.  *Id.*, ¶ 9.  Plaintiff was

13  the older of the two inmates, she was substantially taller than inmate T.K., she had been in prison

14  significantly longer, and she was considered the more sophisticated offender, capable of handling

15  and defending herself.  *Id.*  Housing plaintiff and inmate T.K. together therefore met the policy

16  criteria and was deemed a suitable placement for both inmates.  *Id.*

17       Plaintiff moved into inmate T.K.'s cell on April 5, 2019.  *See id.*, Attach. C, F.  On May

18  16, 2019, plaintiff reported that she had been sexually assaulted by inmate T.K.  *Id.*, ¶ 10, Attach.

19  G.  Plaintiff was taken to an offsite medical facility for an evaluation and upon her return to the

20  facility a PREA investigation was conducted and a keep separate order was issued between

21  plaintiff and inmate T.K.  *Id.*  Following the investigation, the PREA allegations were found to

22  be unsubstantiated.  *Id.*  At no time during the period plaintiff and inmate T.K. were housed

23

REPORT AND RECOMMENDATION
PAGE - 6

together prior to May 16, 2019, did plaintiff report any concerns for her safety, or make any other complaints about her housing assignment, despite having avenues available to do so.  *Id*., ¶ 11.

### 2.    Hormone Replacement Therapy (HRT)

Plaintiff was diagnosed with gender dysphoria by the mental health staff at the CBCC in 2003, though she did not seek any treatment for her condition for many years.  Dkt. 41, ¶ 4. According to plaintiff, she first began seeking treatment for her gender dysphoria after her transfer to TRU in May 2018.  *Id*., ¶ 9.

Gender dysphoria is a condition where an individual experiences discomfort or distress because their gender identity differs from the sex assigned at birth.  *See* Dkt. 38, ¶ 3; Dkt. 43, ¶¶ 4, 5.  Treatment for gender dysphoria can include medical treatment such as hormone replacement therapy (HRT) and gender affirming surgery, behavioral health treatment, and non-medical/mental health treatment such as hair removal, access to make-up and alternate clothing, and binding/tucking.  Dkt. 38, ¶ 3.[1]  Gender dysphoria is considered a Level 2 condition under the DOC Health Plan which means care is deemed medically necessary under certain circumstances.  Dkt. 37, ¶ 4, Attach. A.  Care for gender dysphoria is provided in accordance with the DOC Gender Dysphoria Protocol.  *Id*., ¶ 4.  At times relevant to this action, the Gender Dysphoria Protocol required that inmates seeking initial HRT receive approval from the Gender Dysphoria Care Review Committee ("GD-CRC" or "Committee").  *Id*., ¶ 4, Attach. B.

---

[1] *See also* World Professional Association for Transgender Health ("WPATH") Standards of Care, pp. 9-10.  https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English2012.pdf?_t=1613669341.

REPORT AND RECOMMENDATION
PAGE - 7

1    In order to obtain GD-CRC review of a request for HRT, an inmate's assigned DOC

2    provider(s) would submit a request to the Committee together with information concerning the

3    inmate's mental health history and diagnoses, treatment expectations, current treatment

4    readiness, and a complete medical evaluation. *See id*. The Committee would also review

5    relevant mental health and medical diagnostic and treatment records, the likely effects of the

6    recommended treatment, and the findings of any outside consultant. *Id*. The GD-CRC would

7    then determine whether the requested treatment was medically indicated. *Id*.

8    Pursuant to the Gender Dysphoria Protocol, inmates seeking HRT are required to submit

9    to an assessment by a mental health professional for purposes of determining whether the

10   inmate's choice for HRT is voluntary and clinically indicated, and whether the inmate fully

11   understands the side effects and has reasonable expectations of HRT. *Id*., ¶ 6. Such assessments

12   can normally be completed in two to three interviews, but the process can take longer depending

13   on the mental health provider's workload and the need to obtain additional information to

14   formulate an opinion. *Id*. At times relevant to this action, once the assessment was completed, it

15   was the responsibility of the mental health provider to submit the HRT request to the GD-CRC

16   for consideration. *Id*. If the request was approved, it would then be sent to the inmate's medical

17   provider to determine whether there were any medical contraindications to the HRT. Dkt. 39, ¶

18   3. Absent any medical contraindications, the medical provider would prescribe the HRT

19   treatment and then monitor the inmate to ensure there were no medical contraindications to the

20   continued use of HRT. *Id*.

21   According to plaintiff, she began seeking treatment for her gender dysphoria almost

22   immediately upon her arrival at TRU by advising corrections staff of her desire "to begin the

23

REPORT AND RECOMMENDATION
PAGE - 8

process of socially and physically transitioning," including wearing feminine clothing and

undergarments, and starting HRT.  Dkt. 41, ¶¶ 7, 9, 10.  However, it was not until several months

later that plaintiff first spoke to a medical provider about her gender dysphoria.  On October 26,

2018, plaintiff met with her primary care provider, PA-C Horne, and informed her that she was

considering male-to-female gender transition.  Dkt. 39, ¶ 5, Attach. A.  Plaintiff indicated to PA-

C Horne that she was seeking authorization for female undergarments but did not wish to pursue

hormone treatment at that time.  *Id*.  PA-C Horne informed plaintiff that CRC review was

mandated for treatment of gender dysphoria "per DOC protocol," and that medical could not

authorize alternate undergarments.  *Id*.  PA-C Horne sent a referral form to mental health for

follow-up of a possible gender dysphoria diagnosis.  *Id*.  This appointment was plaintiff's only

in-person encounter with PA-C Horne.  *Id*., ¶ 5.

Based on her interaction with PA-C Horne at this October 2018 appointment, plaintiff

believed PA-C Horne would submit requests to the CRC for alternate clothing and, thereafter, for

HRT, and that no further action was required on plaintiff's part.  Dkt. 41, ¶ 13.  In early January

2019, plaintiff submitted a health services kite to MCC-TRU medical seeking an update on the

CRC meeting regarding her transgender issues.  *Id*., ¶ 16, Ex. A.  PA-C Horne responded to the

kite, advising that mental health could enter a consult for hormone treatment but had not done so

at that point.  *Id*., Ex. A.  PA-C Horne also corrected information she had provided plaintiff at

the October 2018 appointment, advising that alternate underclothing did not require CRC

approval as she had believed, and that plaintiff could request alternate underclothing from her

Custody Unit Supervisor who could provide paperwork and schedule her for measurement by the

nursing staff.  *Id*.

REPORT AND RECOMMENDATION
PAGE - 9

After receiving PA-C Horne's response to her kite, plaintiff requested to meet with mental health to initiate the evaluation process for HRT, and she was scheduled to meet with psychologist Arthur Davis, Ph.D to begin the process. Dkt. 41, ¶ 17. Dr. Davis was at that time the mental health clinical lead at TRU and his duties included conducting evaluations of inmates diagnosed with gender dysphoria. Dkt. 38, ¶¶ 2, 3. According to Dr. Davis, when an inmate made a request for HRT, his duties included conducting an assessment to determine whether the inmate understood the HRT treatment and its effects, and to determine whether there were mental health conditions which would be contraindicated to HRT. *Id*., ¶ 4.

Plaintiff met with Dr. Davis on January 14, 2019, for the first session of her transgender psychological assessment. *Id*., ¶ 7, Attach. B. At this appointment, Dr. Davis reviewed the purpose of the assessment, explaining that the goal was to explore areas of concern and answer questions regarding transgenderism. *Id*. Dr. Davis also discussed revision of DOC practices regarding transgender inmates. *Id*. Plaintiff reported no feelings of depression or suicidal ideation related to gender dysphoria at this appointment, and Dr. Davis deemed her mood pleasant. *Id*.

Plaintiff met with Dr. Davis on January 28, 2019, for the second session of her transgender psychosocial assessment. *Id*., ¶ 8, Attach. C. At this appointment, Dr. Davis sought to obtain plaintiff's history so he could understand plaintiff's point of view, and he sought to discuss with plaintiff her transgender concerns, including specific details about her sexuality. *Id*. Plaintiff was reticent to discuss such issues, but Dr. Davis nonetheless deemed plaintiff cooperative during the session and he described her mood as pleasant. *Id*. Dr. Davis also noted

REPORT AND RECOMMENDATION
PAGE - 10

1   in his encounter report that plaintiff reported no feelings of depression or suicidal ideation related

2   to her gender dysphoria during their time together.  *See id*.

3          Plaintiff met with Dr. Davis on February 12, 2019, for the third session of her

4   psychosocial assessment.  *Id*., ¶ 9, Attach. D.  This session included discussions about the

5   transgender housing protocol and HRT outcomes.  *See id*.  Plaintiff related to Dr. Davis her fears

6   and anxieties about her housing situation in light of the fact that her cellmate, with whom she had

7   been living well, was expected to be leaving soon.  *Id*.  Plaintiff also indicated during this session

8   that she would like to start HRT immediately.  *Id*.  Dr. Davis explained that if HRT was

9   indicated, there would be a referral to primary care and that psychiatry would also be involved.

10  *Id*.  Dr. Davis advised plaintiff that all of the procedures were voluntary and that the DOC

11  "hope[d] that TG patients [would] consent to the comprehensive approach being provided

12  through mental health, psychology and medical staff involved."  *Id*., Attach. D.  According to the

13  primary encounter report of this meeting, plaintiff "was quite agreeable and expressed

14  appreciation for the careful approach being taken."  *See id*.  Once again, according to Dr. Davis,

15  plaintiff reported no feelings of depression or suicidal ideation related to gender dysphoria

16  during their time together.  *Id*., ¶ 9.

17         Plaintiff met with Dr. Davis on April 8, 2019, for the fourth session of her transgender

18  psychosocial assessment.  *Id*., ¶ 10, Attach. E.  During this session plaintiff expressed concerns

19  about Dr. Davis's use of pronouns and requested that feminine pronouns be used in documents

20  and conversations.  *Id*.  Plaintiff also again expressed concerns about housing placement

21  procedures and about being housed with others who could present a safety risk.  *Id*.  HRT was

22  also a topic of discussion and Dr. Davis informed plaintiff during the session that a diagnosis of

23

REPORT AND RECOMMENDATION
PAGE - 11

gender dysphoria was no longer required to receive HRT. *Id.* Dr. Davis went on the explain that the purpose of the psychosocial assessment was to make sure the patient fully understands the request for HRT and is psychologically fit to undergo such a medical intervention. *Id.* Dr. Davis deemed plaintiff's affect and mood pleasant during their session and plaintiff again reported no feeling of depression or suicidal ideation related to gender dysphoria. *Id.*

Plaintiff met Dr. Davis on May 6, 2019, for their fifth, and ultimately final, session of the transgender psychosocial assessment. Dkt. 38, ¶ 11; Dkt. 43, Ex. K.[2] During this session, they reviewed the parameters of the transgender protocol and the DSM-5 Personality Assessment Inventory that Dr. Davis planned to administer at a subsequent session.[3] *Id.* Plaintiff expressed discomfort with some of the questions posed by Dr. Davis during the session and elected not to answer them. *Id.* According to Dr. Davis, plaintiff's mood remained mostly pleasant though she indicated some mild anger/frustration about the evaluation process. *Id.* Plaintiff once again reported no feelings of depression or suicidal ideation related to gender dysphoria during this session. *Id.*

On May 20, 2019, plaintiff met with Dr. Davis again, though this time for purposes of a PREA mental health assessment in relation to the alleged sexual assault by inmate T.K. discussed above. *See id.*, ¶ 12, Attach. G. Plaintiff reported to Dr. Davis at that time that she felt safe given that she had been assigned to a new cell in a new unit with a new roommate. *Id.* Plaintiff apparently had no further interaction with Dr. Davis after this date.

---

[2] Dr. Davis, in his declaration, identifies Attachment F as the encounter report of his May 6, 2019, meeting with plaintiff, but the document provided to the Court is actually a duplicate of Attachment E, the encounter report for April 8, 2019. *See* Dkt. 38, Attach. F. Plaintiff submitted the May 6, 2019, encounter report with her summary judgment materials. *See* Dkt. 43, Ex. K.

[3] The DSM-5 Personality Assessment Inventory was apparently never administered. Dkt. 41, ¶ 30.

REPORT AND RECOMMENDATION
PAGE - 12

On July 25, 2019, plaintiff filed a grievance complaining about the delay in her receiving HRT. Dkt. 41, ¶ 34, Ex. I. Plaintiff's grievance was investigated and, on August 13, 2019, the grievance coordinator provided a response in which she advised that there was no current CRC request for HRT. *Id.*, Ex. I. The grievance coordinator also noted that plaintiff was working with Dr. Davis to be placed on HRT and explained that the process included several interviews and assessments that must be done prior to the request being submitted to the CRC for review. *Id.* Plaintiff was advised that Dr. Davis was aware of her request and would meet with her again to continue the process. *Id.*

On August 22, 2019, plaintiff appealed the grievance coordinator's response to the superintendent of her facility. *Id.*, ¶ 34, Ex. K. In her appeal, plaintiff expressed concern that Dr. Davis had told her he submitted his referral to the CRC for approval of HRT only to learn through the grievance response that this was not true. *Id.* Plaintiff explained that this was concerning because the delay in approving HRT was having a negative impact on her mental health. *Id.*

On September 25, 2019, Dr. Davis produced a report regarding plaintiff's request for HRT.[4] Dkt. 38, ¶ 13, Attach. H. Dr. Davis indicated  he had determined plaintiff was competent to make a decision about HRT, there were no obvious psychiatric concerns that would contraindicate HRT, and he would consult with PA-C Horne regarding a medical referral for

---

[4] Dr. Davis suggests in his declaration that he conducted an in-person interview with plaintiff on this date (*see* Dkt. 38, ¶ 13), but the report, identified as a mental health assessment, appears to instead be a summary of the previous psychosocial assessment interviews Dr. Davis conducted with plaintiff and his findings and conclusions regarding plaintiff's request for HRT (*see id.*, Attach. H).

REPORT AND RECOMMENDATION
PAGE - 13

1    HRT.  *See id*.  Dr. Davis submitted a formal referral to the CRC for consideration of plaintiff's

2    request for HRT on October 1, 2019.  Dkt. 43, Exs. O, P.

3          On October 16, 2019, the superintendent of plaintiff's facility provided a response to her

4    pending grievance appeal regarding her complaints about delays in receiving HRT.  Dkt. 41, Ex.

5    K.  The superintendent explained there had apparently been some miscommunication between

6    plaintiff and Dr. Davis regarding the process, and that Dr. Davis had referred plaintiff's request

7    for HRT to the CRC in August and the request was awaiting review and decision by the

8    Committee.  *Id*.  On October 20, 2019, plaintiff appealed the superintendent's response to her

9    grievance to DOC headquarters.  *Id*., Ex. O.  Plaintiff insisted in her appeal that there had been

10   no miscommunication between her and Dr. Davis, and she noted that it had taken eight months

11   for Dr. Davis to make the referral (from January 2019 to August 2019) and that another two

12   months had since passed with no answer from the CRC.  *Id*.

13         On November 27, 2019, plaintiff met with psychology associate Amber Owens about her

14   HRT request.  *See* Dkt. 37, ¶ 9[5]; Dkt. 41, ¶ 39, Ex. N.  Plaintiff spoke with Ms. Owens about

15   thoughts she had had about auto-castration and suicide, though she indicated she didn't plan to

16   go through with them and would contact mental health if she had any suicidal ideation.  Dkt. 37,

17   ¶ 9; Dkt. 41, ¶ 39.  Ms. Owens advised plaintiff that her HRT referral was scheduled for

18   consideration by the CRC on March 12, 2020.  *Id*.  Plaintiff states in her declaration in support of

19   her motion for partial summary judgment that though she was not happy with how long she

20

21          [5]  Dr. Rainer, in her declaration describing this encounter, references Attachment C to her declaration.
22   However, Attachment C is a mental health encounter report from March 18, 2020 involving a different mental health
     provider and is, in fact, a duplicate of Attachment E to Dr. Rainer's declaration.  *See* Dkt. 37, Attach. C, E.

23

REPORT AND RECOMMENDATION
PAGE - 14

1    would have to wait for a decision, knowing that a time had been set to discuss her case was a

2    "huge relief."  Dkt. 41, ¶ 39.

3        On December 17, 2019, Dr. Rainer became aware of plaintiff's complaints regarding the

4    timeliness of her HRT request when she was asked to respond to plaintiff's grievance appeal.

5    Dkt. 37, ¶ 10.  Dr. Rainer's investigation of plaintiff's complaint revealed that Dr. Davis's

6    assessment had been completed but, because of his departure and the resulting change in

7    plaintiff's mental health providers, there had been a delay in scheduling plaintiff's request for

8    HRT to be considered by the GD-CRC.  *Id.*  Dr. Rainer, in her response to plaintiff's grievance

9    appeal, advised that plaintiff was on the schedule for her HRT request to be reviewed by the GD-

10   CRC on March 12, 2020.[6]  *See id.*; Dkt. 41, Ex. O.

11       On March 11, 2020, plaintiff met with a mental health provider in preparation for her

12   GD-CRC review the following day.  Dkt. 37, ¶ 11, Attach. D.  During this meeting, plaintiff

13   expressed concerns about any further delay in HRT and reported that her appearance as a male

14   led to depressed feelings.  *Id.*  There are no notes in the report of this encounter indicating

15   plaintiff had any suicidal ideation at that time.  *Id.*  On March 18, 2020, plaintiff met with

16   another mental health provider who advised her that there had been a delay in the GD-CRC

17   reviewing her request for HRT and that it would occur the following day.  *Id.*, ¶ 12, Attach. E.

18   The provider noted in her report of this encounter that plaintiff seemed understanding and

19

20       [6] Dr. Rainer indicates in her declaration that after becoming aware of plaintiff's complaints about the
     timeliness of her HRT request, she had plaintiff placed on the GD-CRC schedule for the next available date, which
21   was March 12, 2020.  Dkt. 37, ¶ 10.  It appears, however, that by the time Dr. Rainer reviewed plaintiff's grievance
     appeal, plaintiff had already been scheduled for GD-CRC review.  *See* Dkt. 41, Ex. N.  It thus appears that Dr.
22   Rainer, in conducting her review/investigation of plaintiff's grievance appeal, merely confirmed that plaintiff was on
     the GD-CRC schedule.

23

REPORT AND RECOMMENDATION
PAGE - 15

1    expressed gratitude for the report by the mental health staff.  *Id*.  There is no indication that

2    plaintiff reported any suicidal ideation or feelings of depression during this encounter.  *See id*.

3          Following additional delays, plaintiff's request for HRT was finally reviewed by the GD-

4    CRC on April 2, 2020, and on April 9, 2020 the CRC issued a final report approving plaintiff for

5    HRT.  Dkt. 39, ¶ 7, Attach. B.  Just over a month later, on May 13, 2020, plaintiff met with her

6    assigned medical provider, PA-C Ngo, to discuss moving forward with the HRT.  *Id*.  Plaintiff

7    signed a consent to begin treatment and PA-C Ngo ordered bloodwork to ensure there were no

8    medical contraindications to HRT.  *Id*.; Dkt. 43, Ex. Q.

9          On May 28, 2020, PA-C Ngo submitted a consultation request for an MRI because

10   plaintiff's bloodwork revealed elevated levels of prolactin and thyroid stimulating hormone

11   ("TSH").  Dkt. 39, ¶ 8, Attach. C.  The consultation request included PA-C Ngo's consult with

12   an endocrinologist, Dr. Hammond, from whom PA-C Ngo had requested advice regarding when

13   it would be safe to proceed with HRT in light of plaintiff's elevated hormone levels.  *Id*.

14         On June 3, 2020, plaintiff was seen by a mental health provider because she was being

15   transferred to a new therapist's caseload and the therapist wanted to begin a treatment plan.  Dkt.

16   37, ¶ 14, Attach. G.  There was discussion during this appointment about plaintiff's goals

17   regarding HRT treatment and mental health treatment.  *Id*., Attach. G.  The notes of this

18   encounter indicate that plaintiff showed some frustration at the timeliness of the process for

19   HRT, relating in this instance to the bloodwork not having been done earlier in the process, but

20   that she was cooperative and "did not appear especially distressed."  *Id*.

21         On June 7, 2020, Dr. Hammond issued his findings in relation to PA-C Ngo's

22   consultation request and recommended it would be safe to proceed with the HRT if an MRI was

23

REPORT AND RECOMMENDATION
PAGE - 16

1    conducted showing no macroadenoma, or if PA-C Ngo saw normalization of plaintiff's elevated

2    prolactin and TSH levels. Dkt. 39, ¶ 8, Attach C. Dr. Awad approved the request for the MRI

3    on June 8, 2020. *Id*. Plaintiff met with PA-C Ngo on June 11, 2020, to go over Dr. Hammond's

4    recommendations and plaintiff verified that she preferred to have the MRI completed. *Id*., ¶ 9,

5    Attach. D. The MRI was completed on July 7, 2020 and, on July 20, 2020, the results of the

6    MRI came back as not clinically concerning. *Id*., ¶ 52 and Ex. W. Plaintiff was not seen again

7    by PA-C Ngo until September 17, 2020, at which time orders were entered for the hormones.

8    *See* Dkt. 39, ¶ 10, Attach. E. Plaintiff received her first dose of HRT shortly thereafter. Dkt. 41,

9    ¶ 54.

10    Plaintiff filed the instant action *pro se* in September 2019, and she alleged in her original

11    complaint only an Eighth Amendment failure to protect claim against Mr. Hathaway and Ms.

12    Cohn arising out of their decision to house plaintiff with inmate T.K.. *See* Dkts. 1, 8. Plaintiff

13    subsequently amended her complaint to add claims pertaining to the delays in approving her

14    request for HRT, though she identified no additional defendants in her amended pleading. *See*

15    Dkt. 16. In March 2020, counsel appeared on plaintiff's behalf and plaintiff was thereafter

16    granted leave to file a second amended complaint, which is the operative pleading in this action.

17    *See* Dkts. 17, 22, 26, 27.

18    <u>DISCUSSION</u>

19    Plaintiff identifies six claims for relief in her second amended complaint. She first alleges

20    that Ms. Cohn, Mr. Hathaway and Sergeant Silva violated her Eighth Amendment rights when

21    they failed to protect her from sexual assault by another inmate. Dkt. 27 at 11-12. Plaintiff

22    alleges in her second claim for relief that Dr. Awad, Dr. Barnett, Dr. Davis, PA-C Horne, and Dr.

23

REPORT AND RECOMMENDATION
PAGE - 17

Rainer violated her Eighth Amendment rights when they failed to provide proper medical care for her gender dysphoria. *Id*. at 12-14. Plaintiff alleges in her third ground for relief that Ms. Cohn, Mr. Hathaway, and Sergeant Silva violated her Fourteenth Amendment right to equal protection when they imposed housing assignments that were discriminatory in nature. *Id*. at 14-15. Plaintiff alleges in her fourth claim for relief that the State of Washington and the DOC violated the Americans with Disabilities Act and the Rehabilitation Act when they failed to provide reasonable accommodations for plaintiff's PTSD and her gender dysphoria. *Id*. at 15-17. Plaintiff alleges in her fifth claim for relief that the State of Washington, the DOC, Dr. Awad, Dr. Barnett, Dr. Davis, PA-C Horne, and Dr. Rainer were negligent in failing to timely complete the necessary steps for plaintiff to access care and treatment for her gender dysphoria. *Id*. at 17-18. Finally, plaintiff alleges in her sixth claim for relief that the State of Washington, the DOC, Ms. Cohn, Mr. Hathaway, and Sergeant Silva were negligent in allowing her to be housed with an inmate who had a history of sexual assault and predatory behavior towards other transgender inmates. *Id*. at 18-19.

Defendants argue in their summary judgment motion that they are entitled to judgment as a matter of law with respect to all claims asserted in plaintiff's second amended complaint. Dkt. 35. Plaintiff argues in her motion for partial summary judgment that she is entitled to judgment as a matter of law with respect to her Eighth Amendment deliberate indifference claim (Claim 2), and with respect to her medical negligence claim (Claim 5). Dkt. 40.

### A.    Applicable Legal Standards

#### 1.    *Summary Judgment Standard*

Summary judgment is appropriate when a "movant shows that there is no genuine dispute

REPORT AND RECOMMENDATION
PAGE - 18

1   as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

2   56(a).  The moving party is entitled to judgment as a matter of law when the nonmoving party

3   fails to make a sufficient showing on an essential element of his case with respect to which he

4   has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving

5   party bears the initial burden of showing the district court "that there is an absence of evidence to

6   support the nonmoving party's case."  *Id*. at 325.  The moving party can carry its initial burden

7   by producing affirmative evidence that negates an essential element of the nonmovant's case, or

8   by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of

9   persuasion at trial.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102

10  (9th Cir. 2000).  The burden then shifts to the nonmoving party to establish a genuine issue of

11  material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The

12  Court must draw all reasonable inferences in favor of the nonmoving party.  *Id*. at 585-87.

13          In supporting a factual position, a party must "cit[e] to particular parts of materials in the

14  record . . .; or show[] that the materials cited do not establish the absence or presence of a

15  genuine dispute, or that an adverse party cannot produce admissible evidence to support the

16  fact."  Fed. R. Civ. P. 56(c)(1).  The nonmoving party "must do more than simply show that

17  there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*, 475 U.S.

18  at 585.  "[T]he requirement is that there be no *genuine* issue of material fact. . . .  Only disputes

19  over facts that might affect the outcome of the suit under the governing law will properly

20  preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-

21  48 (1986) (emphasis in original).  The central issue is "whether the evidence presents a sufficient

22  disagreement to require submission to a jury or whether it is so one-sided that one party must

23

REPORT AND RECOMMENDATION
PAGE - 19

1    prevail as a matter of law." *Id*. at 251-52.

2        The opposing party must present significant and probative evidence to support its claim

3    or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).

4    "The mere existence of a scintilla of evidence in support of the non-moving party's position is

5    not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d

6    1216, 1221 (9th Cir. 1995).  Nor can the nonmoving party "defeat summary judgment with

7    allegations in the complaint, or with unsupported conjecture or conclusory statements."

8    *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

9        When parties file cross-motions for summary judgment, as the parties have done here, each

10   motion "must be considered on its own merits." *Fair Housing Council of Riverside County, Inc. v.*

11   *Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  The court must review the evidence

12   submitted in support of each cross-motion.  *Id*.  And, although the parties may each assert there are

13   no uncontested issues of material fact, the Court must determine whether disputed issues of

14   material fact are present.  *Id*.; *Osborn v. Butler*, 712 F. Supp. 2d 1134, 1148 (D. Idaho 2010).

15           *2.    Section 1983 Standard*

16       In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that

17   she suffered a violation of rights protected by the Constitution or created by federal statute, and

18   (ii) that the violation was proximately caused by a person acting under color of state law.  *See*

19   *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).  The causation requirement of § 1983

20   is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in

21   another's affirmative act, or omitted to perform an act which he was legally required to do that

22

23

REPORT AND RECOMMENDATION
PAGE - 20

caused the deprivation complained of.  *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

"The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."  *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).   Vicarious liability may not be imposed on a supervisory employee for the acts of their subordinates in an action brought under 42 U.S.C. § 1983.  *Lemire v. California Dep't of Corrs. & Rehabilitation*, 726 F.3d 1062, 1074 (9th Cir. 2013).  A supervisor may, however, be held liable under § 1983 "if he or she was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation." *Jackson* v. *City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001).

> **B.     Analysis**

> > *1.     Eighth Amendment: Failure to Protect*

Plaintiff alleges in her first claim for relief that Ms. Cohn, Mr. Hathaway, and Sergeant Silva violated her Eighth Amendment rights when they allowed her to be housed with another transgender inmate, T.K., who had a history of sexual assault on other inmates and who sexually assaulted plaintiff after they were housed together at TRU.  *See* Dkt. 27, ¶¶ 58-69.  Plaintiff asserts that defendants knew she had a history of sexual victimization at the hands of other inmates and ignored the risks to her health and safety when they approved the request of plaintiff and inmate T.K. to be housed together, thereby causing plaintiff physical harm and extreme emotional distress.  *See id*., ¶¶ 64-66, 69.

1    The Eighth Amendment imposes a duty upon prison officials to provide humane

2 conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). This duty includes

3 ensuring that inmates receive adequate food, clothing, shelter, and medical care, and taking

4 reasonable measures to guarantee the safety of inmates. *Id*. In order to establish an Eighth

5 Amendment violation, a prisoner must satisfy a two-part test containing both an objective and a

6 subjective component. The Eighth Amendment standard requires proof that (1) the alleged

7 wrongdoing was objectively "harmful enough" to establish a constitutional violation; and (2) the

8 prison official acted with a sufficiently culpable state of mind. *Id*. at 834.

9    The objective component of an Eighth Amendment claim is "contextual and responsive

10 to 'contemporary standards of decency.'" *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting

11 *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). The state of mind requirement under the subjective

12 component of the Eighth Amendment standard has been defined as "deliberate indifference" to

13 an inmate's health or safety. *Farmer*, 511 U.S. at 834. Under the "deliberate indifference"

14 standard, a prison official cannot be found liable for denying an inmate humane conditions of

15 confinement unless the official knows of and disregards an excessive risk to inmate health or

16 safety. *Id*. at 837. "[T]he official must both be aware of facts from which the inference could be

17 drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*.

18    Defendants argue that they are entitled to summary judgment with respect to plaintiff's

19 failure to protect claim because plaintiff fails to demonstrate that they knew she faced a

20 substantial risk of serious harm and disregarded that risk by failing to take reasonable measures

21 to abate it. Dkt. 35 at 19. Defendants assert that there was nothing in inmate T.K.'s record that

22 would have placed them on notice that she posed a serious risk of harm to plaintiff. *Id*.

23

REPORT AND RECOMMENDATION
PAGE - 22

Defendants note that both plaintiff and inmate T.K. were identified as potential victims in their PREA risk assessments, plaintiff was taller than inmate T.K., both inmates were incarcerated for sex offenses against children while plaintiff was also in custody on a first degree murder charge, and that plaintiff was deemed to be the more sophisticated of the two inmates, having spent many more years in prison than inmate T.K.. *Id.* Defendants maintain that plaintiff at no time expressed any concerns with her housing decision and they were unaware of any other risk factors that made the housing assignment unsafe to either inmate. *Id.*

Plaintiff, in her response to defendants' summary judgment motion, offers no argument or evidence in opposition to defendants' request for judgment as a matter of law with respect to her failure to protect claim.[7] *See* Dkt. 45. Defendants argue in their reply brief that plaintiff has therefore abandoned this claim and the claim must therefore be dismissed. Dkt. 49 at 2, citing *Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) ("We have previously held that a plaintiff has 'abandoned . . . claims by not raising them in opposition to [the defendant's] motion for summary judgment.'" (quoting *Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005)). Though it does appear plaintiff has abandoned her failure to protect claim, the Court will nonetheless briefly address the merits of the claim as the evidence in the record demonstrates that defendants are entitled to summary judgment with respect to this claim.

---

[7] The Court notes that defendants also argue in their summary judgment motion that plaintiff failed to adequately allege in her second amended complaint the personal participation of Sergeant Silva. Plaintiff did not address this argument in her response to defendants' motion for summary judgment thus, apparently, abandoning her claims against Sergeant Silva. In any event, the record adequately demonstrates that Sergeant Silva was not involved in the review or approval of plaintiff's request to be housed with inmate T.K. and plaintiff's general assertion that Sergeant Silva ignored her safety concerns and proper housing protocols by placing her in cells with unfamiliar and sometimes violent individuals (*see* Dkt. 27, ¶¶ 26, 32) is too vague to state a viable failure to protect claim against this defendant. Plaintiff offers nothing in response to defendants' summary judgment motion to demonstrate that Sergeant Silva personally participated in any alleged constitutional violation and plaintiff's claims against Sergeant Silva should therefore be dismissed.

REPORT AND RECOMMENDATION
PAGE - 23

1    The evidence in the record, in the form of Mr. Hathaway's declaration and attached

2    exhibits (*see* Dkt. 36), establishes that plaintiff advocated for the move which resulted in her

3    being housed with inmate T.K., advising Mr. Hathaway that they were friends and that it would

4    be a better fit if she were housed with a "sister." *Id.*, ¶ 8.  Plaintiff also assured Mr. Hathaway

5    that it would be a good move when he expressed some hesitation, unrelated to safety concerns

6    about having two transgender individuals housed together.  Dkt. 36, ¶ 8.  Plaintiff's advocacy

7    was successful in that she persuaded Mr. Hathaway to consent to allow the unit staff to *consider*

8    her housing request.  *See id.*  The request was reviewed, and unit staff determined that housing

9    plaintiff and inmate T.K. together met DOC housing policy criteria, and that it was a suitable

10    placement for both inmates.  *Id.*, ¶ 9.

11    Plaintiff asserts in her complaint that defendants should have known it was an

12    inappropriate placement and she suggests they should have at least informed her about inmate

13    T.K.'s abusive history so she could have made an informed decision.  Dkt. 27, ¶¶ 39, 40.

14    Plaintiff also claims that inmate T.K. had previously been investigated by DOC staff for

15    allegations of sexual abuse of another transgender inmate and that she should therefore have

16    been identified as a potential perpetrator at the time she was housed with plaintiff rather than a

17    potential victim.  Dkt. 27, ¶ 35.  Plaintiff, however, provides no evidence that inmate T.K. was

18    improperly classified or, in fact, that inmate T.K. had a documented history of sexual abuse

19    against other inmates while in DOC custody.

20    The record is devoid of any evidence that defendants knew of, and disregarded, a

21    substantial risk to plaintiff's safety when they approved her request to be housed with inmate

22

23

REPORT AND RECOMMENDATION
PAGE - 24

T.K., and they are therefore entitled to summary judgment with respect to plaintiff's failure to protect claim.

### 2.    *Eighth Amendment: Inadequate Medical Care*

Plaintiff alleges in her second claim for relief that Dr. Awad, Dr. Barnett, Dr. Davis, PA-C Horne, and Dr. Rainer violated her Eighth Amendment rights when they failed to provide timely access to hormone replacement therapy to treat symptoms related to plaintiff's gender dysphoria. Dkt. 27, ¶¶ 70-77. Plaintiff claims that defendants' failure to provide adequately and timely care caused her to suffer extreme emotional distress, including thoughts of self-harm. *Id.*, ¶ 77.

In order to establish an Eighth Amendment violation for inadequate medical care, a plaintiff must demonstrate that she had a "serious medical need," and that defendants' response to that need was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *McGuckin v. Smith,* 974 F.2d 1050, 1059 (9th Cir.1991), *overruled on other grounds by WMX Techs., Inc. v. Miller,* 104 F.3d 1133 (9th Cir. 1997) (en banc)). A prison official is deliberately indifferent to a serious medical need if he "knows of and disregards an excessive risk to inmate health." *Farmer*, 511 U.S. at 837. To be found liable under the Eighth Amendment, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002).

REPORT AND RECOMMENDATION
PAGE - 25

Deliberate indifference is a high legal standard. *Toguchi v. Chung*, 391 F.3d 1051, 1060 9th Cir. 2004). An inadvertent or negligent failure to provide adequate medical care is insufficient to establish a claim under the Eighth Amendment. *Estelle*, 429 U.S. at 105–06; *see also Farmer*, 511 U.S. at 835 ("ordinary lack of due care" is insufficient to establish an Eighth Amendment claim). Moreover, mere differences of opinion between a prisoner and prison medical staff or between medical professionals regarding the proper course of treatment does not give rise to a § 1983 claim. *Toguchi*, 391 F.3d at 1058. "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Id.* (citing *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Defendants argue in their motion for summary judgment that plaintiff has failed to demonstrate that several of the defendants identified in her second ground for relief personally participated in causing the deprivation complained of and that plaintiff's claims against these individuals should therefore be dismissed. Dkt. 35 at 14-16. In particular, defendants argue that plaintiff's complaint is devoid of any specific factual allegations showing how Dr. Awad, Dr. Barnett, or Dr. Rainer violated her rights. *Id.* at 15-16. Defendants further argue that the facts alleged as to PA-C Horne are insufficient to show how she personally participated in the alleged unconstitutional conduct. As to the substance of plaintiff's second claim for relief, defendants argue that plaintiff's disagreement with defendants' decisions regarding her HRT treatment are insufficient to establish an Eighth Amendment violation. *Id.* at 19-21. Plaintiff argues in her motion for partial summary judgment that Dr. Davis and Dr. Rainer acted with deliberate

indifference to her serious medical needs by substantially delaying her hormone therapy. *See* Dkt. 40 at 12-15.

a.    Personal Participation

Plaintiff identifies Dr. Awad and Dr. Barnett as defendants based on their respective roles as Facility Medical Director at MCC at times relevant to this action. Dkt. 27, ¶¶ 8, 9. Plaintiff identifies Dr. Rainer as a defendant based on her role as the DOC Director of Mental Health. *Id.*, ¶ 14. While plaintiff alleges generally in her second claim for relief that all defendants named therein, including these three individuals, failed to provide timely and adequate care for her gender dysphoria, she alleges no specific facts in her complaint describing how these individuals violated her rights. As explained above, in order to adequately allege a cause of action under § 1983, a plaintiff must allege facts showing how individually named defendants caused, or personally participated in causing, the harm alleged in the complaint. *Arnold*, 637 F.2d at 1355. The dearth of facts pertaining to these three individuals suggests that plaintiff named these individuals as defendants based solely on their supervisory responsibility or position which is not permissible in an action brought under § 1983. *Monell v. Department of Social Servs., of City of New York*, 436 U.S. 658, 691–94 (1978). Plaintiff's second amended complaint thus fails to adequately allege any viable cause of action against these three individuals.

In an attempt to salvage her Eighth Amendment claims as to Dr. Awad and Dr. Rainer, plaintiff provides in her in response to defendants' summary judgment motion an explanation of the purported basis of her claims against these individuals.[8] *See* Dkt. 45 at 14-16. Plaintiff

---

[8] Plaintiff does not oppose defendants' request for dismissal of her Eighth Amendment claim against Dr. Barnett and that claim should therefore be dismissed given the absence of any facts implicating this defendant in the violation of plaintiff's rights.

REPORT AND RECOMMENDATION
PAGE - 27

asserts that her claims against Dr. Awad "hinge on" her "role in overseeing the medical department at [MCC], including the development of and protocols for tracking patient care and insuring it is followed up on as appropriate." *Id*. at 15.  Plaintiff maintains that Dr. Awad's failure to develop such procedures "played a substantial role" in the delay in plaintiff's care and the harm she suffered as a result of those delays. *Id*. at 15-16.  Plaintiff also asserts that because her primary care providers at MCC practice medicine under Dr. Awad's license, and are only permitted to do so under her supervision, the failure of plaintiff's primary care provider, PA-C Phu Ngo, to timely schedule and provide her necessary care amounts to a failure by Dr. Awad to adequately supervise her assistants and verify that the care they provide their patients is appropriate. *Id*. at 16.

Plaintiff's purported claims against Dr. Awad are insufficient to establish the requisite causal connection between her conduct and the alleged constitutional deprivation.  To the extent plaintiff claims that Dr. Awad failed in her responsibility to establish robust procedures for tracking patient care, her claim is overly broad and fails to demonstrate that these alleged failures were the cause of the delays in plaintiff ultimately receiving her HRT.  To the extent plaintiff claims that Dr. Awad is responsible for her subordinate's failure to timely schedule and provide care, he is attempting to have Dr. Awad held liable in this action based on a theory of vicarious liability which, as noted above, is impermissible in an action brought under § 1983.

With respect to Dr. Rainer, plaintiff asserts in her response to defendants' summary judgment motion that Dr. Rainer participated in the alleged violation of plaintiff's Eighth Amendment rights through her oversight of the DOC policy requiring plaintiff's request for HRT to be evaluated by Dr. Davis and to then be reviewed by the CRC.  *Id*. at 14.  Plaintiff also

REPORT AND RECOMMENDATION
PAGE - 28

asserts that Dr. Rainer participated through her direct oversight of Dr. Davis who testified at his deposition that he spoke with Dr. Rainer regularly about patient care and transgender issues.  *Id*. Finally, plaintiff asserts that Dr. Rainer, in investigating plaintiff's grievance appeal, was tasked with reviewing plaintiff's medical records and therefore must have been aware at the time she provided her response to the grievance that nearly a year had passed since plaintiff's first meeting with Dr. Davis to evaluate her for HRT.  *Id*. at 15.  Plaintiff complains that despite this knowledge, Dr. Rainer allowed the GD-CRC review of plaintiff's HRT request to be scheduled another three months in the future, thus adding to an already substantial delay.  *Id*.

Plaintiff, in her motion for partial summary judgment, reiterates her assertions that Dr. Rainer is liable under the Eighth Amendment based upon her role in overseeing what plaintiff believes is a flawed policy; *i.e.*, the Gender Dysphoria Protocol, and based upon her direct oversight of Dr. Davis.  *See* Dkt. 40 at 13.  Because plaintiff's claims against Dr. Rainer are intertwined with those asserted against Dr. Davis, the Court deems it most appropriate to undertake a substantive analysis of the claims rather than recommend dismissal of the claims based on failure to establish personal participation.

Finally, with respect to PA-C Horne, while plaintiff alleges some facts against PA-C Horne in her second amended complaint, those facts pertain only to PA-C Horne's responses to health services kites submitted by plaintiff seeking updates on her request for HRT and do not demonstrate any personal participation by PA-C Horne in the alleged delay in plaintiff's receipt of the treatment.  Dkt. 27, ¶¶ 30, 43.  Plaintiff does not argue otherwise in her response to defendants' summary judgment motion, and plaintiff's claims against PA-C Horne should therefore be dismissed.

REPORT AND RECOMMENDATION
PAGE - 29

b.      Deliberate Indifference

As to the substance of plaintiff's Eighth Amendment medical deliberate indifferent claim, there is no dispute here that plaintiff's gender dysphoria constitutes a serious medical need for Eighth Amendment purposes.  At issue here is solely whether defendants were deliberately indifferent to that need.  Plaintiff claims that Dr. Davis and Dr. Rainer acted with deliberate indifference when they substantially delayed her access to hormone therapy.  Dkt. 40 at 12-15. Plaintiff maintains that Dr. Davis's lengthy evaluation process deviated from the standard of care for transgender patients, and that she suffered while awaiting review of her request for HRT.  *Id*. at 12-13.  Plaintiff claims that Dr. Rainer bears responsibility for the delays because she spoke frequently with Dr. Davis regarding his evaluation and care of transgender inmates and was well aware of how long it took Dr. Davis to conduct his evaluations of transgender patients.  *Id*. at 13. Plaintiff also claims that Dr. Rainer was responsible for maintaining the DOC policy requiring both a psychological evaluation and GD-CRC approval before an inmate could gain access to HRT, a policy which plaintiff claims was flawed and not aligned with modern medical standards. *Id*.

Defendants argue in their motion for summary judgment that though plaintiff may not have agreed with the extent of Dr. Davis's assessment, including his need for multiple interviews over a period of months, plaintiff's allegations of deliberate indifference amount to nothing more than a difference of opinion on the requirements for assessing the need for HRT.  Dkt. 35 at 21; Dkt. 44 at 4.  Defendants further argue that there was no evidence before Dr. Davis at the time he was conducting the interviews that plaintiff was suffering any distress, noting that the records of the interviews show that plaintiff displayed no symptoms which would have placed Dr. Davis or

REPORT AND RECOMMENDATION
PAGE - 30

1    any other defendant on notice that there was an immediate acute need for the HRT which would

2    have required the assessment to be completed more quickly. *See id*. Defendants maintain that

3    there is no evidence that any of the defendants were aware that following the DOC's Gender

4    Dysphoria Protocol process was medically inadequate or was in conscious disregard for

5    plaintiff's health. *Id*.

6         The crux of plaintiff's argument is that the treatment decisions of Dr. Davis and, by

7    extension, Dr. Rainer, were not medically acceptable because they deviated substantially from

8    accepted standards of care for treating individuals with gender dysphoria. *See* Dkt. 40 at 12-15.

9    Plaintiff takes issue with the length of the evaluation process endorsed by defendants and with

10   the fact that DOC policy, at times relevant to this action, required both a psychological

11   evaluation and GD-CRC approval for hormone therapy. *Id*. at 13. Plaintiff complains that the

12   policy and/or process deprives gender dysphoric individuals of prompt care and thereby

13   exacerbates their suffering. *See id*. at 12-13; Dkt. 45 at 11-13.

14        Plaintiff asserts that there is only one accepted method of treating gender dysphoria and

15   that is the method set forth by WPATH in their *Standards of Care*. *Id*. at 14. Plaintiff offers in

16   support of this assertion the declaration of Dr. Randi Ettner, a clinical and forensic psychologist

17   who specializes in the treatment, diagnosis, and management of patients with gender dysphoria.

18   Dkt. 42, ¶ 1. Dr. Ettner is an author of the WPATH *Standards of Care for the Health of*

19   *Transsexual, Transgender and Gender-nonconforming People* (7th version), published in 2011,

20   and she states that this publication contains internationally recognized guidelines for the

21   treatment of persons with gender dysphoria, and that numerous professional associations endorse

22   the protocols for treating gender dysphoria in accordance with these guidelines. *Id*., ¶¶ 2, 8.

23

REPORT AND RECOMMENDATION
PAGE - 31

Dr. Ettner states in her declaration in support of plaintiff's motion for partial summary judgment that, in accordance with the *Standards of Care*, medical providers can prescribe and administer hormones without consultation or referral from mental health professionals. *Id.*, ¶ 13. Dr. Ettner identifies information a provider must obtain before initiating treatment, and notes that though there are circumstances in which a provider should consult with a mental health professional before proceeding, an extensive psychosocial evaluation of a patient's history and development is not required prior to initiating cross-sex hormones, nor is psychological testing. *Id.*

Dr. Ettner concedes she has not personally evaluated plaintiff. *Id.*, ¶ 21. She opines, however, based on her review of plaintiff's medical records, Dr. Davis's treatment notes, plaintiff's grievances, and the DOC's gender dysphoria protocol, that the treatment plaintiff received deviated significantly from the well-accepted standard of care and fell below what would be considered competent care. *Id.*, ¶¶ 21, 22. In particular, Dr. Ettner maintains that the fact that Dr. Davis met with plaintiff on five occasions over five months without completing an evaluation and referring her for medical treatment is a significant departure from the standard of care, causing plaintiff to suffer unnecessarily and placing her at a heightened risk of self-harm or suicide. *Id.*, ¶¶ 22, 23. According to Dr. Ettner, a mental health professional with experience in the area of gender dysphoria can verify a diagnosis in one or two sessions and determine the medical necessity of HRT, especially in cases like plaintiff's where there is no history of thought disorders or psychosis. *Id.*

Accepting for purposes of the pending motions that the WPATH *Standards of Care* are, as plaintiff maintains, the definitive standards governing transgender care, the Court observes

REPORT AND RECOMMENDATION
PAGE - 32

that Dr. Ettner's representation of what the standards require are somewhat inconsistent with the standards themselves.  In particular, the *Standards of Care* appear to contemplate that a psychosocial assessment *will* be performed by a mental health professional prior to the initiation of hormone therapy.  Dkt. 41-3, Ex. A-1, pg. 34.  While the *Standards of Care* provide that a health professional who is appropriately trained in behavioral health and is competent in the assessment of gender dysphoria may provide an assessment in lieu of an assessment by a mental health professional (*see id*., Ex. A-1, pg. 26), there is no suggestion that the assessment should be jettisoned as Dr. Ettner suggests.

The Court also observes that aside from the fact that the DOC Gender Dysphoria Protocol in place at times relevant to this action required GD-CRC approval before initiation of hormone therapy, the DOC protocol, on its face, does not appear inconsistent with the WPATH *Standards of Care*.  *See* Dkt. 37, Attach. B; Dkt. 41-3, Ex. A-1.  The Court acknowledges that the *Standards of Care* provide that transgender individuals seeking treatment should "receive prompt and attentive evaluation, with the goal of alleviating their gender dysphoria and providing them with appropriate medical services."  Dkt. 41-3, Ex. A-1, pg. 25.  The same paragraph, however, provides that mental health professionals "have a responsibility to . . . assist clients with making fully informed decisions and becoming adequately prepared," and that they "need to have functioning working relationships with their clients and sufficient information about them."  *See id*.  This language appears to leave room for various approaches to assessing and assisting individual clients seeking HRT, including that employed by defendants here.  Plaintiff's attempt to demonstrate deliberate indifference based on defendants' alleged divergence from the *Standards of Care* is unavailing.

REPORT AND RECOMMENDATION
PAGE - 33

1    The fact that Dr. Davis's psychosocial assessment may have been more comprehensive

2    than plaintiff, or Dr. Ettner, believes was necessary to assess plaintiff's request for HRT

3    constitutes a mere difference of opinion which does not give rise to a claim of deliberate

4    indifference.  The Court, in reaching this conclusion, does not discount the fact that Dr. Davis's

5    conduct, as a whole, arguably led to substantial delays in the process of approving plaintiff's

6    request for HRT.  However, the record demonstrates that the delays attributable to Dr. Davis

7    were primarily based on his misunderstanding of the process and his role in it.

8    Dr. Davis's deposition testimony reveals that though he understood he was to conduct an

9    assessment to determine whether or not hormone treatment was contraindicated in plaintiff's

10    case, he did not understand it to be his job to inform the GD-CRC about his determination.  Dkt.

11    47-1, Ex. 1 (Davis Dep.), 75:17-25.  As Dr. Davis explained, he believed plaintiff had already

12    met the criteria for HRT and "was on a path to receive hormones."  Davis Dep., 75:25-76:3.  Dr.

13    Davis further explained that he understood he was providing a "simultaneous service," and that

14    he "wasn't working with the belief that this patient's hormone prescriptions were contingent on

15    my results."  Davis Dep., 76:1-6; *see also* Davis Dep., 113:10-114:18, 131:3-16; 132:20-133:11.

16    While there is nothing laudatory about Dr. Davis's lack of familiarity with the process, his

17    conduct does not demonstrate any intentional interference or delay.  The Court further notes in

18    this regard that there is no evidence in the record demonstrating that Dr. Rainer was aware of this

19    deficit and failed to take steps to correct it.

20    The Court now turns to the question of whether Dr. Davis and Dr. Rainer, in failing to

21    expedite review of plaintiff's request for HRT, knew of and disregarded an excessive risk to

22    plaintiff's health.  Dr. Davis states in his declaration in support of defendants' summary

23

REPORT AND RECOMMENDATION
PAGE - 34

judgment motion that at no time during his meetings with plaintiff did she ever display suicidal ideations, depression, or any other symptoms which would require HRT before the assessment could be completed.[9]  Dkt. 38, ¶ 14.  Dr. Davis's encounter reports of their assessment meetings likewise give no indication that plaintiff was suffering any significant distress related to her gender dysphoria during the assessment process such that Dr. Davis should have been on notice that treatment decisions should be expedited.  *Id.*, ¶¶ 7-11, Attach. B-E; Dkt. 43-1, Ex. K.

Plaintiff disputes the assertion that Dr. Davis did not know she was suffering as a result of her gender dysphoria and the delays in receiving treatment for her condition.  Plaintiff, in her declaration in support of her motion for summary judgment, maintains that she spoke with Dr. Davis during their sessions about the impact of her gender dysphoria, including her self-image problems and her past practice of self-harm.[10]  Dkt. 41, ¶ 22.  Plaintiff states that she also conveyed to Dr. Davis that she was experiencing stress over not being able to access HRT, and indicates that her repeated requests about the status of her referral to the CRC were met with indifference.  *Id.*, ¶ 22.  Plaintiff does not, however, assert that she was showing any overt signs of distress such that Dr. Davis should have known that failure to hasten treatment posed an excessive risk to plaintiff's health.

Of particular note in this regard is Dr. Davis's consultation request for GD-CRC review of plaintiff's request for HRT which he issued on October 1, 2019.  Dr. Davis noted  plaintiff's endorsement of symptoms of gender dysphoria, a history of major depression, PTSD, and personality difficulties but also indicated that plaintiff's SMI (serious mental illness) status was

---

[9] Of course, as noted above, Dr. Davis apparently didn't believe plaintiff's receipt of HRT was dependent upon his assessment.

[10]  The record indicates that plaintiff's prior suicide attempts were over 20 years in the past.  *See* Dkt. 51 at Ex. B.

REPORT AND RECOMMENDATION
PAGE - 35

relatively mild and that her symptoms had been in remission prior to, and throughout, her

transgender psychosocial assessment. Dkt. 43-2, Ex. O. Dr. Davis further noted that "Jennifer

approached the entire interview process with this psychologist in a rather cooperative,

forthcoming and friendly manner and indicating an openness to accepting whatever the opinions

health services offered." *Id*. This description of plaintiff's behavior throughout the assessment

process undermines the suggestion that she displayed any concerning behaviors during her

interviews with Dr. Davis.[11]

Plaintiff argues that even absent specific complaints or indicia of suffering due to the

delay in her care, Dr. Davis and Dr. Rainer, assuming they were appropriately qualified to

evaluate and treat plaintiff's gender dysphoria, knew or should have known the medical

consequences of delaying hormone therapy to a gender dysphoric patient, including new or

increased depression, anxiety, suicidality, and low self-esteem. *See* Dkt. 45 at 13-15; Dkt. 42, ¶¶

7, 18. However, whether or not Dr. Davis or Dr. Rainer *should* have known is simply not a part

of the Eighth Amendment analysis. The relevant question is whether they knew of, and

disregarded, a significant risk to plaintiff's health. Plaintiff offers no evidence that they did.

Finally, to the extent plaintiff complains that Dr. Rainer's handling of her grievance

appeal relating to the delays in her gaining access to HRT amounts to deliberate indifference,

plaintiff also fails to establish any violation of her Eighth Amendment rights. Plaintiff merely

alleges that Dr. Rainer was aware of the significant amount of time that had passed since

---

[11] The record confirms plaintiff assertions that during the time it took for her to receive HRT treatment she sent kites to the medical and mental health staffs complaining about her suffering, and that she discussed with other mental health providers her frustration about the lengthy DOC process and the distress she was experiencing. However, it appears that all of these contacts occurred after Dr. Davis completed his assessment and was no longer involved in plaintiff's care.

REPORT AND RECOMMENDATION
PAGE - 36

1  plaintiff's first meeting with Dr. Davis to evaluate her for HRT, she states somewhat definitively

2  that given Dr. Rainer's qualifications as a psychologist she *knew* this delay caused plaintiff harm,

3  and she complains that Dr. Rainer nonetheless *allowed* plaintiff's GD-CRC review to be

4  scheduled for March 2020, adding another three month delay to the process.  Dkt. 45 at 15.

5  Plaintiff, however, submits no evidence demonstrating that Dr. Rainer actually knew plaintiff

6  was suffering in a significant way as the result of delays in the HRT approval process, nor does

7  she submit any evidence demonstrating that Dr. Rainer had any actual ability to move up the date

8  scheduled for plaintiff's GD-CRC review.  This claim against Dr. Rainer is based on speculation,

9  not evidence, and is insufficient to demonstrate that Dr. Rainer was deliberately indifferent to

10  plaintiff's serious medical needs.

11        In sum, defendants, in conjunction with their motion for summary judgment, have

12  presented evidence that neither Dr. Davis nor Dr. Rainer was deliberately indifferent to

13  plaintiff's serious medical needs.  Plaintiff, in her opposition papers, asserts, but fails to

14  establish, that there are genuine issues of material fact which preclude entry of judgment in favor

15  of defendants with respect to her Eighth Amendment medical deliberate indifference claim.

16  Defendants' motion for summary judgment should therefore be granted with respect to this

17  claim.  The evidence submitted by plaintiff in conjunction with her own motion for partial

18  summary judgment is insufficient to demonstrate that either Dr. Davis or Dr. Rainer was

19  deliberately indifferent to her serious medical needs, and plaintiff's motion should therefore be

20  denied with respect to her Eighth Amendment medical deliberate indifference claim.

21

22

23

1

        3.     *Equal Protection*

2          Plaintiff alleges in her third claim for relief that the housing assignments imposed upon

3 her by Ms. Cohn, Mr. Hathaway, and Sergeant Silva were discriminatory in nature and violated

4 her rights under the Fourteenth Amendment.  Dkt. 27, ¶¶ 78-86.  The Equal Protection Clause of

5 the Fourteenth Amendment prohibits a state from denying to "any person within its jurisdiction

6 the equal protection of the laws."  U.S. Const. amend. XIV § 1.  The Equal Protection Clause

7 essentially mandates that state and local governments treat alike all persons who are similarly

8 situated.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  In order to

9 establish a violation of the Equal Protection Clause, a plaintiff must present evidence of

10 discriminatory intent.  *See Washington v. Davis*, 426 U.S. 229, 239-40 (1976).

11         Defendants argue in their motion for summary judgment that plaintiff has made only

12 sweeping allegations of discrimination and that her complaint is devoid of any facts which

13 evidence discriminatory intent related to defendants' housing decisions.  Dkt. 35 at 18.  Plaintiff,

14 in her response to defendants' summary judgment motion, offers no argument or evidence in

15 opposition to defendants' request for judgment as a matter of law with respect to her equal

16 protection claim.  *See* Dkt. 45.  Defendants argue, as they did with respect to plaintiff's failure to

17 protect claim, that plaintiff has abandoned her equal protection claim and that the claim should

18 therefore be dismissed.  Dkt. 49 at 2.  Though it does appear plaintiff has abandoned her equal

19 protection claim, the Court will nonetheless briefly address the merits of the claim as the

20 evidence in the record demonstrates that defendants are entitled to summary judgment with

21 respect to this claim.

22

23

REPORT AND RECOMMENDATION
PAGE - 38

While plaintiff contends the housing assignments imposed upon her were discriminatory in nature, and caused her harm, she fails to allege facts showing she was treated differently from similarly situated inmates or that any of the defendants acted with discriminatory intent in making housing decisions with respect to her. Moreover, the evidence in the record demonstrates offender housing assignments are made based on a set of objective criteria, designed to ensure safe, suitable, and sustainable placements for all inmates. *See* Dkt. 36, Attach. A., DOC Policy 420.140. Plaintiff offers no evidence that these criteria were applied to her in a discriminatory fashion or with any discriminatory intent.

To the extent plaintiff claims the specific decision to house her with inmate T.K. violated her equal protection rights, her claim is likewise without merit. The evidence shows plaintiff specifically requested this housing assignment and referred to inmate T.K. as both a "sister" and a friend in making her case for the assignment to Mr. Hathaway. *Id*., ¶ 8. The evidence also shows that plaintiff's request was granted only after a complete review was conducted by DOC staff ensuring that plaintiff and inmate T.K. were compatible and that the requested move met policy requirements. *See id*., ¶ 9. The record is devoid of any evidence that defendants violated plaintiff's equal protection rights in making their decisions regarding plaintiff's housing. Defendants are therefore entitled to summary judgment with respect to this claim.

### 4.    *Americans with Disabilities Act/Rehabilitation Act*

Plaintiff alleges in her fourth claim for relief that the State of Washington and the DOC violated the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA") when they failed to provide her with reasonable accommodations and other services related to her disabilities; *i.e.*, posttraumatic stress disorder (PTSD) and gender dysphoria, and when they

REPORT AND RECOMMENDATION
PAGE - 39

1    denied her the rights and benefits given to other inmates, solely by reason of her disabilities. *See*

2    Dkt. 27, ¶¶ 87-101.  Plaintiff asserts that she made defendants aware of her need for reasonable

3    accommodations by repeatedly communicating to defendants her need for medical and mental

4    health evaluation and treatment, and her need for safe housing assignments which would not put

5    her at risk of further harm or trigger or exacerbate the symptoms of her PTSD.  *Id.*, ¶¶ 96, 98.

6    Plaintiff claims that defendants' denial of timely access to medical and mental health evaluation

7    and treatment, and their assignment of plaintiff to a cell with an inmate with a known history of

8    sexual assault, constitute discrimination based on plaintiff's disabilities, and caused her to suffer

9    prolonged mental and emotional distress, anxiety, and thoughts of self-harm.  *Id.*, ¶¶ 100, 101.

10          Title II of the ADA and § 504 of the RA both prohibit discrimination on the basis of

11    disability.  The ADA applies only to public entities, whereas the RA proscribes discrimination in

12    all federally funded programs.  To establish a violation of Title II of the ADA, a plaintiff must

13    show that (1) she is a qualified individual with a disability; (2) she was excluded from

14    participation in or otherwise discriminated against with regard to a public entity's services,

15    programs, or activities, and (3) such exclusion or discrimination was by reason of her disability.

16    *Lovell v. Chandler*, 303 F.3d 1039, 1053 (9th Cir. 2002) (citing *Weinreich v. Los Angeles County*

17    *Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997)).  Similarly, to establish a violation of §

18    504 of the RA, a plaintiff must show that (1) she is an individual with a disability; (2) she is

19    otherwise qualified for the benefit or services sought; (3) she was denied the benefit or services

20    solely by reason of her disability; and (4) the program providing the benefit or services receives

21    federal financial assistance.  *See id.*

22

23

REPORT AND RECOMMENDATION
PAGE - 40

1       Defendants argue in their summary judgment motion that plaintiff's ADA claim fails

2 because she cannot demonstrate that she meets the criteria set forth above for establishing such a

3 claim.[12]  Dkt. 35 at 16-17.  Specifically, defendants argue that other than broad, sweeping,

4 claims that her HRT request took too long and her housing assignments should consider her

5 mental health diagnosis, she asserts no actual facts showing how she was excluded from

6 participation or otherwise discriminated against based on her gender dysphoria or PTSD

7 diagnosis.  *Id*. at 17.  Defendants note that there is nothing in the record to indicate any mental

8 health provider recommended special housing accommodations based on plaintiff's mental

9 health diagnosis or that she ever sought any accommodation.  *Id*.  Finally, defendants argue that

10 to the extent plaintiff intends to assert that she has received inadequate treatment for a disability,

11 her claim necessarily fails.  *Id*.

12       As with plaintiff's failure to protect and equal protection claims, plaintiff likewise offers

13 no argument or evidence in opposition to defendants' request for judgment as a matter of law

14 with respect to her ADA/RA claim.  *See* Dkt. 45.  Defendants once again argue that plaintiff has

15 abandoned her claim and that the claim should therefore be dismissed.  Dkt. 49 at 2.  The Court

16 concurs that plaintiff has arguably abandoned the claim but will nonetheless briefly address the

17 substance of the claim as defendants have demonstrated that the claim is properly dismissed on

18 the merits.

19

20       [12]  Defendants do not present any specific argument pertaining to plaintiff's RA claim.  However, because

21 "[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act," resolution of the ADA claim necessarily resolves the RA claims as well.  *See Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999).

22

23

REPORT AND RECOMMENDATION
PAGE - 41

To the extent plaintiff intends to assert that she has received inadequate treatment for her medical and mental health concerns, her claim fails as it is well-settled that an allegation that a condition was not properly treated, standing alone, is insufficient to make out a claim under the ADA. *See Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010) ("The ADA prohibits discrimination because of disability, not inadequate treatment for disability."), *overruled on other grounds by Castro v. Cty. of L.A.*, 833 F.3d 1060 (9th Cir. 2016) (en banc).

To the extent plaintiff asserts that defendants violated the ADA/RA when they failed to provide reasonable accommodations with respect to her need for housing assignments which would not trigger or exacerbate symptoms of her PTSD, plaintiff fails to demonstrate that she requested any specific, reasonable, accommodations on this basis, and she also fails to demonstrate any intentional discrimination on the part of defendants as she is required to do in order to recover monetary damages under Title II of the ADA or under the RA. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001). As plaintiff seeks only monetary damages in her second amended complaint (*see* Dkt. 27 at 19), and as she fails to demonstrate any discriminatory intent, her ADA/RA claim necessarily fails and should therefore be dismissed.

### 5.    *State Law Negligence Claims*

In addition to the federal constitutional claims asserted by plaintiff in her second amended complaint, she also asserts state law negligence claims. Dkt. 27, ¶¶ 102-112. The Supreme Court has stated that federal courts should refrain from exercising their pendent jurisdiction when the federal claims are dismissed before trial. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Because plaintiff's federal claims are subject to dismissal based upon her failure to establish any violation of her federal constitutional or statutory rights, this Court

REPORT AND RECOMMENDATION
PAGE - 42

should decline to exercise jurisdiction over plaintiff's state law claims.

CONCLUSION

Based on the foregoing, this Court recommends that defendants' motion for summary judgment be granted, that plaintiff's motion for partial summary judgment be denied, and that plaintiff's second amended complaint and this action be dismissed with prejudice as to plaintiff's federal claims and without prejudice as to plaintiff's state law negligence claims. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **August 6, 2021**.

DATED this 21st day of July, 2021.


S. KATE VAUGHAN
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 43