UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JASON "JENNIFER" LEE SUTTON, | CASE NO. C19-1500 MJP |
| Plaintiff, | ORDER ON OBJECTIONS TO THE REPORT AND |
| v. | RECOMMENDATION |
| STATE OF WASHINGTON, et al., | |
| Defendants. | |

This matter comes before the Court on the Report and Recommendation of Magistrate Judge S. Kate Vaughan. (Dkt. No. 53 ("R&R").) Having reviewed the R&R, Plaintiff's Objections to the R&R (Dkt. No. 54), Defendants' Response to the Objections (Dkt. No. 55), Plaintiff's Supplemental Brief (Dkt. No. 58), Defendants' Response to the Supplemental Brief (Dkt. No. 59), the briefing on the Cross-Motions for Summary Judgment (Dkt. Nos. 35, 40, 44, 45, 49, 50), and all supporting materials, the Court ADOPTS in part and DECLINES TO ADOPT in part the R&R.

# BACKGROUND

Plaintiff Jason "Jennifer" Lee Sutton is a transgender woman and state prisoner who filed suit in 2019 against the State of Washington and various state employees for failing to provide her timely medical care and to ensure her safety from other inmates. She alleges that Defendants failed to timely treat her gender dysphoria and that this violated the Eighth and Fourteenth Amendments and constitutes negligence. She also alleges that she was sexually assaulted by another inmate and that Defendants violated her Eighth Amendment rights and acted negligently by failing to provide for her safety. She also alleges claims of disability discrimination.

## A.    Procedural background

The parties filed competing motions for summary judgment. Defendants sought summary judgment on all claims. (Def. MSJ (Dkt. No. 35).) Sutton sought partial summary judgment on liability regarding her Eighth Amendment and negligence claims stemming from the failure to timely provide treatment for her gender dysphoria. (Pl. MPSJ at 2, 8 (Dkt. No. 40).) She also sought a permanent injunction related to the Department of Corrections' (DOC) policies for treating gender dysphoria.

Magistrate Judge Vaughan issued an R&R, in which she recommended the Court grant Defendants' motion for summary judgment, deny Sutton's motion, and dismiss the action in full. The R&R recommended the Court decline to exercise supplemental jurisdiction over Sutton's negligence claims. Sutton timely filed objections to which Defendants responded. Long after the objections were ripe, this matter was reassigned to the undersigned Judge. After reassignment, the Court called for additional briefing on the negligence claim and qualified immunity. The matter was fully brief on September 14, 2022.

1    Sutton objects to the R&R's conclusions as to her Eighth Amendment claims concerning

2    the treatment she received for her gender dysphoria. She also challenges the R&R's

3    recommendation that the Court decline to exercise supplemental jurisdiction over her negligence

4    claims concerning the same conduct. She does not otherwise challenge the recommended

5    dismissal of all other claims. Defendants urge the Court to adopt the R&R in full. They also

6    suggest that Sutton's federal claims are subject to qualified immunity, an issue the R&R does not

7    reach. And they argue that Sutton's negligence claims fail on the merits.

8    **B.    Factual Background**

9    Jennifer Sutton is an inmate at the Twin Rivers Unit at the Monroe Correctional Facility.

10   She has been in DOC custody since 1995 when she was 19 years old. (Dkt. No. 36, Attach C;

11   Declaration of Jason "Jennifer" Lee Sutton ¶ 2 (Dkt. No. 41).) A transgender woman, Sutton has

12   suffered from gender dysphoria from at least 2003, according to a diagnosis from the mental

13   health staff at Clallam Bay Corrections Center. (Sutton Decl. ¶ 4.) In May 2018, she sought to

14   obtain access to hormone replacement therapy (HRT) to treat her gender dysphoria. (Sutton

15   Decl. ¶ 9.) Although she ultimately obtained HRT, it took well over two years for her to receive

16   her first dose of HRT. (Sutton Decl. ¶ 54.) The Court reviews facts relevant to Sutton's efforts to

17   obtain HRT.

18       **1.    Gender Dysphoria and the Applicable DOC Policies**

19   Gender dysphoria is a condition where an individual experiences discomfort or distress

20   because their gender identity differs from the sex assigned at birth. (See Declaration of Arthur

21   Davis, Ph.D. ¶ 3 (Dkt. No. 38); Declaration of Dr. Randi Ettner ¶¶ 4-5 (Dkt. No. 43).) Although

22   gender dysphoria is a "highly treatable condition," without treatment "adults with gender

23   dysphoria experience a range of debilitating psychological symptoms such as anxiety,

24

1   depression, suicidality, and other attendant mental health issues." (Ettner Decl. ¶ 7.) Treatment

2   can include medical treatment such as hormone replacement therapy (HRT) and gender affirming

3   surgery, behavior health treatment, and non-medical treatment such as hair removal, access to

4   make-up and alternative clothing and binding/tucking. (Davis Decl. ¶ 3; Ettner Decl. ¶¶ 9-12.)

5          Because Sutton remains in DOC custody, the Court considers the applicable DOC

6   Gender Dysphoria Protocol. (Rainer Decl. ¶ 4 & Attach. B.) Under the DOC Health Plan, gender

7   dysphoria is a Level 2 condition, meaning that care is deemed medically necessary under certain

8   circumstances. (Declaration of Karie Rainer, Ph.D. ¶ 4 (Dkt. No. 37).) To begin the process to

9   obtain HRT, an inmate must obtain "an assessment conducted by a mental health professional to

10  determine the individual's choice for the HRT is voluntary, clinically indicated, and that the

11  inmate fully understands the side effects and reasonable expectations of HRT." (Id. ¶ 6.) The

12  Director of Mental Health for DOC, Karie Rainer, Ph.D., states that "[n]ormally mental health

13  provider HRT assessments can be completed in two to three interviews" but that "the mental

14  health provider's workload and need to obtain additional information to make a decision may

15  extend the HRT assessment process." (Id.) If the mental health provider recommends HRT, they

16  then submit a request for HRT to the Gender Dysphoria Care Review Committee (CRC), which

17  reviews the request to determine whether it is "clinically indicated." (Id. ¶¶ 4, 6.) Although the

18  Gender Dysphoria Protocol indicates that any "provider assigned to the case" could request the

19  CRC to review the HRT request, the HRT process was "initiated and reviewed by their mental

20  health provider." (Rainer Decl. Attach. B at 1 (Dkt. No. 37-2 at 2); Declaration of Areig Awad,

21  MD ¶ 3 (Dkt. No. 39).) If the CRC approves HRT, the inmate's medical provider then initiates

22  their medical examination and treatment determination to ensure that there are no contradictions

23

24

1  to the HRT. (Rainer Decl. ¶ 6; Awad Decl. ¶ 3.) The protocol does not specify the length of time

2  this process should take. (Rainer Decl. Attach. B.)

3  **2.  Sutton's Attempts to Obtain HRT**

4  Although Sutton's request for HRT generally followed the DOC process, the process

5  took over two years to complete. The Court reviews the timeline to frame the question of

6  whether the delays Sutton faced amount to deliberate indifference and negligence.

7  In May 2018, Sutton informed her counselor at the Twin Rivers Unit that she was

8  transgender, and sought to: (1) obtain feminine clothing, (2) change her pronouns from male to

9  female; and (3) obtain HRT. (Sutton Decl. ¶ 7.) Her counselor then entered a request for Sutton

10  to see mental health and medical staff to discuss starting the HRT process. (Id. ¶ 9.) After six

11  months of delay, Sutton met with Adelaide Horne, PA-C in October 2018 to discuss her request

12  for feminine clothing. (Id. ¶ 13.) Horne (incorrectly) informed Sutton that the CRC had to review

13  the clothing request. Sutton assumed that Horne would submit a request to the CRC for both

14  feminine clothing and HRT. (Id.) Horne did not inform Sutton that she needed a mental health

15  evaluation. (Id.) It was not until January 2019, when Sutton sent a Health Services Kite to

16  request an update from Horne that she learned that the CRC did not have to approve feminine

17  clothing, but that Sutton needed a mental health consult to start the HRT process. (Id. ¶ 15.)

18  After submitting a grievance about these delays, Sutton finally met with Arthur Davis, Ph.D., a

19  psychologist, on January 14, 2019 to start the mental health evaluation for HRT. (Id. ¶ 17.)

20  From January 14, 2019 through May 6, 2019, Sutton met with Davis five times. During

21  these sessions, Sutton explained to him her past practice of self-harm, including suicide ideation,

22  and the stress and sleeplessness that she was experiencing from not being able to access HRT.

23  (Sutton Decl. ¶ 22.) Early in their meetings, Sutton asked Davis when he would refer her case to

24

the CRC, and "he consistently maintained that he would submit the referral when he got around to it." (Id. ¶¶ 22, 29, 30.) In addition, Sutton avers that Davis asked her detailed questions about what sexual acts she enjoyed performing and how she utilized her genitals during intercourse. (Id. ¶ 18.) When asked under oath, Davis stated that he wanted to get a "detailed sexual history" not because of the DOC's transgender protocol but "[b]ecause I needed to know . . . to evaluate the patient's sexual history" and that this was possibly an issue that the medical provider would want to know. (Davis Dep. at 65-70 (Dkt. No. 43-1 at 11-16).) Sutton also avers that Davis refused to use female pronouns and that she felt trapped by having to deal with Davis as a means to obtain HRT. (See Sutton Decl. ¶¶ 18-19.) As the R&R details, Davis's notes of the encounters with Sutton suggest that she did not report any distress, other than discomfort with questions about her sexual history and the pace with which the request for HRT was being evaluated. (R&R at 10-12.)

Davis did not submit his referral to the CRC for Sutton's HRT until October 1, 2019. (Dkt. No. 43-2 at 15.) He only did so only after Sutton filed a grievance in July 2019 about the delay. (See Sutton Decl. ¶ 34.) In response to the grievance, Davis reported to the DOC Health Services Manager and Grievance investigator that he had made a referral to the CRC in August. (Dk. No. 43-2 at 2.) This was false. He only presented the referral on October 1, 2019. And Davis has provided no reason for delaying his referral from May 6, 2019 until October 1, 2019. Ultimately, the DOC staff responded to Sutton's grievance, suggesting that there was only a miscommunication, a point Sutton disputes. (Sutton Decl. Exs. K & O.)

After Davis's referral to the CRC, Sutton met with psychology associate Amber Owens in late November 2019 to discuss the HRT request and Sutton's ideations of auto-castration and suicide. (Sutton Decl. ¶ 39; see Dkt. No. 43-2 at 33.) As the R&R notes, Sutton also told Owens

1   that she was relieved the CRC would consider her request, though she was unhappy it would take

2   until March 2020 for the CRC to convene. (Dkt. No. 43-2 at 33.) And Owens noted that Sutton

3   did not plan to go through with her ideations of self-harm. (Id.)

4         On December 27, 2019, Dr. Rainer responded to Sutton's grievance about the delays in

5   receiving HRT, and suggested that the delays were related to Davis's departure from the DOC.

6   (Rainer Decl. ¶ 10.) But Rainer does not say when Davis departed, and it appears he was there

7   through at least October 1, 2019.

8         Though the CRC initially stated it would consider the HRT request in March 2020, it did

9   not do so until April 2020. The CRC approved Sutton's HRT request on April 9, 2020.

10   (Declaration of Areig Awad, M.D. at ¶ 7 (Dkt. No. 39).) It then took a month for Sutton to see a

11   health care provider to begin medical testing to ensure there were no medical contraindications

12   for HRT. (Dkt. No. 43 Ex. Q.) Sutton then had bloodwork performed in May 2020 and an MRI

13   in June 2020 due to some apparent delays. And it was not until September 2020 that Sutton

14   finally got her first dose of HRT. (Dkt. No. 41 ¶ 54.) She alleges that Dr. Areig Awad is largely

15   to blame, given his supervisory role in the medical process of the HRT approval and the

16   numerous delays she faced from the medical staff.

17       **3.**    **Standard of Care**

18         As to the proper standard of care for prescribing HRT for gender dysphoria, Sutton points

19   to the World Professional Association for Transgender Health (WPATH) Standards of Care for

20   the Health of Transsexual, Transgender and Gender-nonconforming People (7th Ed. 2011)

21   ("WPATH Standards of Care"). WPATH is an international association of 2,500 medical and

22   mental health professionals specializing in gender diverse people. (Ettner Decl. ¶ 2.) Randi

23   Ettner, Ph.D., is one of the authors of the WPATH Standards of Care and has provided several

24

declarations in support of Sutton's claims. She claims that the WPATH Standards of Care are internationally recognized and the American Medical Association, the American Psychological Association, the American Psychiatric Association, and the World Health Organization "endorse protocols for treating gender dysphoria in accordance with the WPATH Standards of Care." (Id. ¶ 7.) She explains that gender dysphoria is "highly treatable" but that "without treatment, "adults with gender dysphoria experience a range of debilitating psychological symptoms such as anxiety, depression, suicidality, and other attendant mental health issues." (Id.) She notes that recent studies have shown a 41% rate of suicide attempts in the population of individuals suffering from this condition. (Id.)

Ettner avers that HRT is identified in the WPATH Standards of Care "as an evidence-based protocol for treating individuals with gender dysphoria" and that "[f]or individuals with persistent, well-documented gender dysphoria, hormone therapy is an essential, medically indicated treatment to alleviate the distress of the disorder." (Ettner Decl. ¶ 10.) Ettner maintains that the WPATH Standards of Care do not necessarily require a mental health consultation or referral, but the "provider [prescribing HRT] needs to ascertain that the patient is of the age of majority, capable of consenting to treatment, and that if the patient has medical or mental health issues, they are reasonably well-controlled." (Id. ¶ 13.) Ettner does not suggest that the WPATH standards have a set timeline for decision-making, but she notes that untreated gender dysphoria can result in serious physical and psychological harm, including suicidal ideation, suicide, attempted and actual auto-castration, anxiety, depression, and hopelessness. (Id. ¶¶ 15, 18-20.)

### 4.    Expert Opinion on Sutton's Care

Ettner has provided her expert opinion on the facts of this case, though she has not personally evaluated Sutton. Ettner notes that Davis's consultations with Sutton over 5 months

and his delay in recommending treatment is "a significant departure from the standard of care." (Ettner Decl. ¶ 23.) She concludes that Sutton's "providers fundamentally misunderstood the serious medical condition of gender dysphoria and lacked the expertise and understanding to provide effective care." (Ettner Decl. ¶ 24.) And in a second declaration, she opines that "[g]iven Dr. Davis' lack of appropriate competency in this specialized field, the Department of Corrections should not have assigned Ms. Sutton's evaluation for hormone therapy to him in the first place.' (Second Declaration of Randi Ettner ¶ 7 (Dkt. No. 47).) She opines that "a mental health professional with experience in this specialized area can verify a diagnosis in one or two sessions and determine the medical necessity of hormone therapy, especially in cases like Ms. Sutton's where the patient has no history of thought disorders or psychosis." (Ettner Decl. ¶ 23.) On this point, Rainer appears to agree—that it can normally take just two to three sessions to complete the mental evaluation. (Rainer Decl. ¶ 6.) Ettner also notes that Davis improperly conflated sex and sexual orientation with gender. (Ettner Decl. ¶ 24.) And she concludes that "[i]t is my professional opinion that, by failing to timely initiate medically necessary hormone therapy, Ms. Sutton suffered unnecessarily and was at heightened risk of self-harm or suicide." (Ettner Decl. ¶ 22.)

## ANALYSIS

**A.**     **Summary Judgment Standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Anderson v. Liberty

1    Lobby, Inc., 477 U.S. 242, 248-50 (1986). A genuine issue of material fact exists where there is

2    sufficient evidence for a reasonable factfinder to find for the nonmoving party. Id. at 248. The

3    moving party bears the initial burden of showing that there is no evidence which supports an

4    element essential to the nonmovant's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

5    Once the movant has met this burden, the nonmoving party then must show that there is a

6    genuine issue for trial. Anderson, 477 U.S. at 250. If the nonmoving party fails to establish the

7    existence of a genuine issue of material fact, "the moving party is entitled to judgment as a

8    matter of law." Celotex, 477 U.S. at 323-24.

9    **B.**    **Deliberate Indifference**

10        The Court reviews Sutton's objections to the R&R's conclusion that there is insufficient

11    evidence to support her claim of deliberate indifference as to Davis and Rainier. The Court

12    agrees with Sutton as to Davis, but not as to Rainer.

13          **1.**    **Legal Standard**

14        To establish an Eighth Amendment violation for inadequate medical care, a plaintiff must

15    demonstrate that: (1) she had a "serious medical need," and (2) that defendants' response to that

16    need was deliberately indifferent. Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citation

17    omitted)). To be found liable under the Eighth Amendment, "the official must both be aware of

18    facts from which the inference could be drawn that a substantial risk of serious harm exists, and

19    he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 836 (1994).

20        A prison official is deliberately indifferent to a serious medical need if he "knows of and

21    disregards an excessive risk to inmate health." Farmer, 511 U.S. at 837. "Indifference 'may

22    appear when prison officials deny, delay or intentionally interfere with medical treatment, or it

23    may be shown by the way in which prison physicians provide medical care.'" Jett, 439 F.3d at

24

1091 (quoting <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059 (9th Cir. 1991), <u>overruled on other</u>

<u>grounds by</u> <u>WMX Techs., Inc. v. Miller</u>, 104 F.3d 1133 (9th Cir. 1997) (en banc)). "If a [prison

official] should have been aware of the risk, but was not, then the [official] has not violated the

Eighth Amendment, no matter how severe the risk." <u>Gibson v. Cnty. of Washoe</u>, 290 F.3d 1175,

1188 (9th Cir. 2002) <u>overruled on other grounds by</u> <u>Castro v. Cnty. of Los Angeles</u>, 833 F.3d

1060, 1076 (9th Cir. 2016).

      As to the first element, the Parties agree that Sutton's gender dysphoria is a serious

medical condition needing treatment. (Def. Reply to MSJ at 4 (Dkt. No. 49) ("Defendants do not

challenge that gender dysphoria is a serious medical condition."); R&R at 30.) As to the second

element, Sutton challenges the R&R's conclusion that Davis and Rainer were deliberately

indifferent to her medical needs. Although the R&R addresses claims against other defendants,

Sutton does not challenge those conclusions and the Court ADOPTS the R&R as to those claims.

Below, the Court focuses on whether the R&R correctly found the allegations insufficient as to

Davis and Rainer.

### 2.    Arthur Davis, Ph.D.

      There is a dispute of material fact as to whether Davis was deliberately indifferent to

Sutton's medical needs.

      First, there is disputed evidence as to whether Davis knew that his recommendation to the

CRC was required for Sutton to obtain HRT. The R&R acknowledges that "Dr. Davis's conduct,

as a whole, arguably led to substantial delays in the process of approving [Sutton's] request for

HRT." (Dkt. No. 53 at 34.) But the R&R suggests that Davis was not deliberately indifferent

because he did not think he had to report to the CRC or that his opinion was a requisite step for

Sutton to receive HRT. (<u>Id.</u>) While supported in the record, (<u>see</u> Davis Dep. at 75-76, 141), this

1  fact is disputed. As Sutton attests, during her January 2019 meetings, she "repeatedly asked him

2  [Davis] about the status of my referral to the CRC and he consistently maintained that he would

3  submit the referral when he got around to it." (Sutton Decl. ¶ 22.) Sutton also maintains that in

4  May 2019 she asked Davis again about why there was a delay in the CRC approval and Davis

5  provided no clear answer. (Id. ¶ 30.) Construing these facts in Sutton's favor, they suggest that

6  Davis was aware of his duty to report to the CRC and its importance to the HRT process. Sutton

7  also reported on July 17, 2019 that "Doctor Davis informed me that he put my case before the

8  CRC Board for approval for HRT" and that "[t]his discussion was over a month ago." (Dkt. No.

9  41-1 at 17.) Davis himself wrote in response to Sutton's grievance from July, that he had

10  submitted his referral to the CRC in August—a statement that was false given that he did not do

11  so until October 1, 2019. (Dkt. No. 43-2 at 2.) This evidence is sufficient to raise a dispute of fact

12  as to Davis's knowledge that he was required to make the referral.

13        Second, there is disputed evidence as to whether Davis knew that his delay was causing

14  Sutton distress. The R&R concludes Davis was not aware of the distress that Sutton experienced

15  from the delay, in part because Davis's notes of their encounters suggests Sutton was not

16  showing overt signs of distress. (R&R at 35-36.) The R&R also suggests that because Davis

17  found Sutton to be affable, she couldn't have been in distress. (Id.) But this does not

18  acknowledge what Sutton says she reported to Davis and what other reports from different

19  providers summarize. Specifically, Sutton reported to Davis her past thoughts of suicide and auto

20  castration from her gender dysphoria. (Sutton Decl. ¶ 22.) She also reported to a different

21  provider that she continued to have these thoughts at least as of November 2019. This shows a

22  continuity of distress that Davis knew about. Davis's notes also reflect the fact that Sutton

23  reported directly to him that she was frustrated with the delays in receiving HRT. Indeed,

24

1    Davis's notes from February 12, 2019 state that he and Sutton "reviewed the patient's request for

2    HRT" and that Sutton "indicated wanting to begin immediately." (Dkt. No. 38-4 at 2.) Taken

3    together and construed in Sutton's favor, this is enough to raise a dispute of fact as to whether

4    Davis knew of Sutton's distress from not receiving HRT and that his failure to make a

5    recommendation stood in the way of that process.

6          Given the disputes of material fact on Davis's knowledge and intent, the Court finds

7    summary judgment improper on this record as to the Eighth Amendment claim.

8          **3.      Karie Rainer, Ph.D.**

9          The Court agrees with the R&R that Sutton has not identified any evidence that Rainer

10   was aware of the harm she suffered from the delay in receiving HRT. The closest Sutton comes

11   is to the testimony from Davis that he was in close contact with Rainer about the gender

12   dysphoria protocols and that he discussed Sutton's case with Rainer. (Dkt. No. 54 at 4.) But

13   Davis only testified that he consulted with Rainer about Sutton, without stating what was

14   discussed or when they spoke. (Dkt. No. 43-1 at 38.) While one might infer from this that Davis

15   told Rainer about Sutton's condition and the need for expediency, there is no evidence to that

16   effect and it would be inappropriate to so conclude. Sutton provides no deposition testimony

17   from Rainer that she was aware of Sutton's condition. And the records only show that she only

18   became aware of Sutton's complaints about the CRC referral process for HRT by December 17,

19   2019. (Rainer Decl. ¶ 10.) And Rainer then placed the referral for the next available CRC

20   meeting in March 2020—although this was then delayed until April 2020. (Id. ¶¶ 10-13.) Even

21   construing these facts in the light most favorable to Sutton, there is no evidence that Rainer knew

22   Sutton was suffering from the delay or that the delay until April for the CRC was deliberately

23   indifferent. The Court therefore ADOPTS R&R's conclusion on this issue.

24

1      **4.**     **Flaws in DOC Policy**

2      While Sutton sought a permanent injunction challenging the validity of the DOC

3  guidelines for HRT, she appears to have abandoned that request. The R&R concludes that there

4  is no basis to find that the DOC guidelines are unreasonable in treating gender dysphoria by

5  having a mental health evaluation as part of the HRT process. (R&R at 30-34.) Sutton does not

6  challenge this conclusion. (See Brief on Qualified Immunity at 5 ("The instant matter does not

7  involve a difference of opinion in how to treat inmates suffering from gender dysphoria, instead

8  this case presents a situation where a mental health professional decided to deliberately delay

9  treatment.") (Dkt. No. 58).) As such, the Court ADOPTS the R&R's conclusion as to this

10  requested relief.

11  **C.**     **Qualified Immunity**

12      Because the R&R recommended dismissal of Sutton's Eighth Amendment claim, it did

13  not need to reach the question of qualified immunity. Given the Court's determination that the

14  Eighth Amendment claim survives as to Davis, it must resolve whether Davis is entitled to

15  qualified immunity.

16      **1.**     **General Legal Standard**

17      "Qualified immunity shields government officials from civil damages liability unless the

18  official violated a statutory or constitutional right that was clearly established at the time of the

19  challenged conduct." Reichle v. Howards, 566 U.S. 658, 664 (2012). "To be clearly established,

20  a right must be sufficiently clear that every reasonable official would have understood that what

21  he is doing violates that right." Id. (brackets and internal quotation marks omitted). "When

22  properly applied, [qualified immunity] protects all but the plainly incompetent or those who

23  knowingly violate the law." Ashcroft v. al–Kidd, 563 U.S. 731, 743 (2011) (internal quotation

24

marks omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Id. at 741; see also Taylor v. Barkes, 575 U.S. 822, 825 (2015) (per curiam).

"[D]efining the relevant right as simply the right to be free from deliberate indifference 'is far too general a proposition to control this case.'" Hamby v. Hammond, 821 F.3d 1085, 1094 (9th Cir. 2016) (quoting City & Cnty. of San Francisco, Calif. v. Sheehan, 575 U.S. 600, 613 (2015)). The Ninth Circuit has explained the specificity required for a "clearly established" right as follows:

> Of course, it is true (as far as it goes) that a plaintiff need not find a case with identical facts in order to survive a defense of qualified immunity; obviously, one can imagine a situation where the officials' conduct is so egregious that no one would defend it, even if there were no prior holding directly on point. See, e.g., Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." (internal quotation marks omitted)). But it should be equally obvious that the farther afield existing precedent lies from the case under review, the more likely it will be that the officials' acts will fall within that vast zone of conduct that is perhaps regrettable but is at least arguably constitutional. So long as even that much can be said for the officials, they are entitled to qualified immunity.

Hamby, 821 F.3d at 1095. And in deciding this issue as a matter of law, the Court "'assum[es] all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor.'" George v. Morris, 736 F.3d 829, 836 (9th Cir. 2013) (quoting Karl v. City of Mountlake Terrace, 678 F.3d 1062, 1068 (9th Cir. 2012)).

### 2.  No Qualified Immunity

Construing the facts in Sutton's favor, the Court finds that Davis's actions constitute a violation of clearly established law. It has long been the case that prison employees cannot intentionally deny or delay access to medical care for a serious medical condition. See Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002) (citing Estelle v. Gamble, 429 U.S. 97, 104-05

(1976)). Here, Defendants admit that Sutton's gender dysphoria is a serious medical condition, and they do not present any specific challenge that HRT was the proper course of treatment for Sutton. While Davis argues that his delayed referral was unintentional, Sutton could well prove at trial that his actions were intentional and that he needlessly delayed her access to therapy for a serious medical condition. Drawing all inferences in Sutton's favor, such actions would violate clearly established law forbidding prison employees for intentionally denying or delaying access to medical care for a serious medical need. See id. Davis is therefore not entitled to qualified immunity.

The Court acknowledges Defendants' argument that Davis must be entitled to qualified immunity because there is no clearly established law on how quickly HRT must be prescribed to treat gender dysphoria. But the Court is unconvinced that such case law was necessary to establish the rights at issue here. The Parties agree that Sutton's gender dysphoria is a serious medical condition that required care through HRT. This case then falls squarely into the existing precedent that clearly establishes the right to timely medical care to treat a serious medical condition. See Clement, 298 F.3d at 906. While there may not be a specific timelines associate for HRT treatment, it is clearly established that a prison employee cannot intentionally delay it, as is asserted here. The Court is confident that "existing precedent . . . placed the . . . constitutional question beyond debate." See al–Kidd, 563 U.S. at 743. The Court therefore DENIES Defendants' request for dismissal of the Eighth Amendment claim under the theory of qualified immunity.

**D.     Negligence**

The Court first reviews supplemental jurisdiction before analyzing the nature of Sutton's claim and whether it survives summary judgment.

1

### 1.    Supplemental Jurisdiction

2

When the Court has original jurisdiction, it "shall have supplemental jurisdiction over all

3

other claims that are so related to claims in the action within such original jurisdiction that they

4

form part of the same case or controversy under Article III of the United States Constitution." 28

5

U.S.C. § 1367(a). But a district court may "decline to exercise supplemental jurisdiction over a

6

claim" in four enumerated circumstances:

7

> (1) the claim raises a novel or complex issue of State law,

8

> (2) the claim substantially predominates over the claim or claims over which the district
> court has original jurisdiction,

9

> (3) the district court has dismissed all claims over which it has original jurisdiction, or

10

> (4) in exceptional circumstances, there are other compelling reasons for declining
> jurisdiction.

11

12

28 U.S.C. § 1367(c). In determining whether to decline supplemental jurisdiction, "a federal

13

court should consider and weigh in each case, and at every stage of the litigation, the values of

14

judicial economy, convenience, fairness, and comity in order to decide whether to exercise

15

jurisdiction over a case brought in that court involving pendent state-law claims." Carnegie-

16

Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988). "[A]ctually exercising discretion and deciding

17

whether to decline, or to retain, supplemental jurisdiction over state law claims when any factor

18

in [§ 1367] subdivision (c) is implicated is a responsibility that district courts are duty-bound to

19

take seriously." Acri v. Varian Assocs., Inc., 114 F.3d 999, 1001 (9th Cir.), supplemented, 121

20

F.3d 714 (9th Cir. 1997), as amended (Oct. 1, 1997).

21

The factors here favor exercising supplemental jurisdiction. First, the Court has original

22

jurisdiction over Sutton's Eighth Amendment claim. Second, Sutton's negligence claims are

23

substantially intertwined with the Eighth Amendment claim, sharing facts and similar standards.

24

It cannot be said that one claim predominates over the other. Third, Sutton's negligence claims

do not raise any novel issues of state law. Fourth, given how much time the Court and Parties

have invested in this case, it would not appear to serve any purpose linked to judicial economy,

convenience, or fairness to dismiss the negligence claim at this late date. See Carnegie-Mellon,

484 U.S. at 350. The Court retains supplemental jurisdiction over the negligence claims.

### 2.      Disputes of Fact as to the Negligence Claims

There are four issues to resolve on the cross-motions concerning Sutton's negligence

claims. First, Defendants argue that Sutton has not sought summary judgment on her negligence

claims against Rainer and Davis, and that those should be dismissed because Sutton did not

oppose Defendants' Summary Judgment Motion on them. Second, the Parties dispute whether

Sutton's claims are for medical or general negligence. Third, Defendants argue that Sutton has

not identified a violation of an applicable medical negligence standard of care and that this

requires dismissal. Fourth, Defendants argue that there is no evidence of injury from any actions

or omissions related to Dr. Awad or the DOC, such that those claims should be dismissed even if

there is a general negligence standard. The Court reviews these four issues.

### a.      Scope of remaining negligence claims

The Court finds that Sutton has sufficiently defended against Defendants' Motion for

Summary Judgment on her negligence claims related to her HRT request as to Davis, Rainer,

Awad, the State, and the DOC.

First, Sutton originally pleaded a claim of negligence against the State, the DOC, Dr.

Awad, Julie Barnett, Davis, Rainer, and Adelaide Horne, and Does VI-X for "[f]ailure to

complete steps to provide access to diagnostic resources to treat gender dysphoria." (Second

Amended Complaint ¶¶ 102-07 (Fifth Claims for Relief) (Dkt. No. 27).) She also pleaded a

claim of negligence against the State, the DOC, Theresa L. Cohn, Michael Hathaway, Sergeant

Silva, and Does I-V for "allowing her to be housed alone with an inmate who had a history of

1    sexual assault and predatory behavior towards other transgender inmates." (Id. ¶¶ 108-12 (Sixth

2    Claim for Relief.)

3          Second, Sutton moved for summary judgment on her negligence claims against Awad,

4    Davis, Rainer, the State and the DOC. (Pl. MPSJ at 8.) Defendants also moved for summary

5    judgment on both negligence claims, and Sutton opposed Defendants' motion explicitly as to

6    Awad and the DOC. Sutton also maintains that by opposing summary judgment on her Eighth

7    Amendment claims against Davis and Rainer, she effectively preserved her negligence claim that

8    turns on the very same facts. The Court finds that Sutton has opposed summary judgment on her

9    negligence claim against Davis and Rainer.

10         The Court therefore Court finds that Sutton has preserved her HRT-related negligence

11   claims (the Fifth Claim for Relief) as to Davis, Rainer, Awad, the State and the DOC. But the

12   Court dismisses the Fifth Claim for Relief as to Barnett, Horne, and Does VI-X, and the Court

13   dismisses the Sixth Claim for Relief as to all named defendants given Sutton's lack of opposition

14   to Defendants' motion for summary judgment on these claims.

### b.    Medical negligence

16         The Parties also dispute whether Sutton's remaining negligence claims are for general

17   negligence or medical negligence. The claims here involve allegations that Davis, Rainer, Awad

18   and the DOC failed to properly provide medical care to treat Sutton's gender dysphoria. Indeed,

19   Sutton specifically alleges that "[t]he general treatment of plaintiff, as described in this

20   complaint, fell below the medically accepted standard of care for the treatment of gender

21   dysphoria." (SAC ¶ 106.) As such, the Court agrees with Defendants that Sutton's negligence

22   claims are medical negligence claims.

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### c.     Standard of care

The Court disagrees with Defendants that Sutton has not identified the necessary medical standard of care. It is true that medical injuries have to satisfy RCW 7.70.040 and that this requires proof of a relevant medical standard of care as well as the traditional tort elements. See Keck v. Collins, 184 Wn.2d 358, 371 (2015). But Sutton has provided evidence of the applicable standard of care for the treatment of gender dysphoria through the testimony of Dr. Ettner. This is sufficient to evaluate Sutton's negligence claims.

### d.     Evidence of injury

The Court disagrees with Defendants' assertion that Sutton fails to identify sufficient injury proximately caused by the claimed negligence. The Court finds sufficient evidence of emotional and psychological injury to survive summary judgment. For example, in November 2019, Sutton reported to Psych Associate Owens that she had a "day to day struggle" with the delays in the CRC and HRT process and that she had thoughts of auto castration and was suffering from auditory hallucinations. (Dkt. No. 43-2 at 33.) Sutton still had to wait nearly a year after making that report to get obtain HRT. Defendants seek to minimize this report of harm by noting that Sutton reported not having a plan or intent to follow through with auto castration. But Sutton's statement does not negate her claim that she suffered ongoing emotional trauma from these sorts of recurring thoughts. And in March 2020, Sutton again reported that gender dysphoria has been "'a lifeline torturous process'" and that "'delaying [HRT] any longer would make [her] life more unbearable.'" (Dkt. No. 43-2 at 35 (quotation in original).) She also reported suffering from depression from her gender dysphoria. (Id.) The Court finds Sutton's report of these injuries sufficient to withstand summary judgment.

*     *     *

1    The Court rejects Defendants' arguments in favor of dismissal of these narrowed

2  negligence claims. The Court also finds disputes of material fact exist as to Sutton's negligence

3  claims against Davis, Rainer, Awad, the State and DOC. The Court therefore DENIES the Cross-

4  Motions for Summary Judgment on the narrowed negligence claim.

5                                    **CONCLUSION**

6    The Court ADOPTS in part and DECLINES TO ADOPT in part the Report and

7  Recommendation. The Court ADOPTS the R&R's conclusion as to Sutton's deliberate

8  indifference against all defendants except Davis. The Court finds that this claim must be resolved

9  by the trier of fact and that it is not barred by qualified immunity. On these issues the Court

10  DECLINES TO ADOPT the R&R.

11    Additionally, the Court DECLINES TO ADOPT the R&R's recommendation as to

12  dismissal of the negligence claim. The Court finds that the narrowed negligence claim must be

13  resolved by the trier of fact.

14    The Court otherwise ADOPTS the R&R and dismisses all other claims.

15    The clerk is ordered to provide copies of this order to Magistrate Judge Vaughn and to all

16  counsel.

17    Dated November 4, 2022.

18

19                                    Marsha J. Pechman
                                      United States Senior District Judge

20

21

22

23

24